# UNITED STATES *v.* MARA, AKA MARASOVICH

No. 71–850.   Argued November 6, 1972—Decided January 22, 1973

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., *post,* p. 23, BRENNAN, J., *post,* p. 22, and MARSHALL, J., *post,* p. 31, filed dissenting opinions.

*Philip A. Lacovara* argued the cause for the United States.   On the brief were *Solicitor General Griswold, Assistant Attorney General Petersen, Wm. Bradford Reynolds, Beatrice Rosenberg,* and *Sidney M. Glazer.*

*Angelo Ruggiero* argued the cause and filed a brief for respondent.

*Phylis Skloot Bamberger* argued the cause for the Federal Community Defender Organization of the Legal Aid Society of New York as *amicus curiae* urging affirmance.   With her on the brief was *William E. Hellerstein.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The respondent, Richard J. Mara, was subpoenaed to appear before the September 1971 Grand Jury in the Northern District of Illinois that was investigating thefts of interstate shipments. On two separate occasions he was directed to produce handwriting and printing exemplars to the grand jury's designated agent. Each time he was advised that he was a potential defendant in the matter under investigation. On both occasions he refused to produce the exemplars.

The Government then petitioned the United States District Court to compel Mara to furnish the handwriting and printing exemplars to the grand jury. The petition indicated that the exemplars were "essential and necessary" to the grand jury investigation and would be used solely as a standard of comparison to determine whether Mara was the author of certain writings. The petition was accompanied by an affidavit of an FBI agent, submitted *in camera,* which set forth the basis for seeking the exemplars. The District Judge rejected the respondent's contention that the compelled production of such exemplars would constitute an unreasonable search and seizure, and he ordered the respondent to provide them. When the witness continued to refuse to do so, he was adjudged to be in civil contempt and was committed to custody until he obeyed the court order or until the expiration of the grand jury term.

The Court of Appeals for the Seventh Circuit reversed. 454 F. 2d 580. Relying on its earlier decision in *In re Dionisio,* 442 F. 2d 276, rev'd, *ante,* p. 1, the court found that the directive to furnish the exemplars would constitute an unreasonable search and seizure. "[I]t is plain that compelling [Mara] to furnish exemplars of his handwriting and printing is forbidden by the Fourth

Amendment unless the Government has complied with its reasonableness requirement . . . ." 454 F. 2d, at 582.

The court then turned to two issues necessarily generated by its decision in *Dionisio*—the procedure the Government must follow and the substantive showing it must make to establish the reasonableness of the grand jury's directive. It rejected the *in camera* procedure of the District Court, and held that the Government would have to present its affidavit in open court in order that Mara might contest its sufficiency. The court ruled that to establish "reasonableness" the Government would have to make a substantive showing: "that the grand jury investigation was properly authorized, for a purpose Congress can order, that the information sought is relevant to the inquiry, and that . . . the grand jury process is not being abused. . . . [T]he Government's affidavit must also show why satisfactory handwriting and printing exemplars cannot be obtained from other sources without grand jury compulsion." 454 F. 2d, at 584–585.

We granted certiorari, 406 U. S. 956, to consider this case with *United States* v. *Dionisio,* No. 71–229, *ante,* p. 1.

We have held today in *Dionisio,* that a grand jury subpoena is not a "seizure" within the meaning of the Fourth Amendment and, further, that that Amendment is not violated by a grand jury directive compelling production of "physical characteristics" that are "constantly exposed to the public." *Ante,* at 9, 10, 14. Handwriting, like speech, is repeatedly shown to the public, and there is no more expectation of privacy in the physical characteristics of a person's script than there is in the tone of his voice. See *United States* v. *Doe (Schwartz),* 457 F. 2d 895, 898–899; *Bradford* v. *United States,* 413 F. 2d 467, 471–472; cf. *Gilbert* v.

*California,* 388 U. S. 263, 266–267. Consequently the Government was under no obligation here, any more than in *Dionisio,* to make a preliminary showing of "reasonableness."

Indeed, this case lacks even the aspects of an expansive investigation that the Court of Appeals found significant in *Dionisio.* In that case, 20 witnesses were summoned to give exemplars; here there was only one. The specific and narrowly drawn directive requiring the witness to furnish a specimen of his handwriting* violated no legitimate Fourth Amendment interest. The District Court was correct, therefore, in ordering the respondent to comply with the grand jury's request.

Accordingly, the judgment of the Court of Appeals is reversed, and this case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BRENNAN, concurring in part and dissenting in part in No. 71–229, *ante,* p. 1, and dissenting in No. 71–850.

I agree, for the reasons stated by the Court, that respondent Dionisio's Fifth Amendment claims are without merit. I dissent, however, from the Court's rejection

---

*The respondent contends that because he has seen neither the affidavit nor the writings in the grand jury's possession, the Government may actually be seeking "testimonial" communications—the content as opposed to the physical characteristics of his writing. But the Government's petition for the order to compel production stated: "Such exemplars will be used solely as a standard of comparison in order to determine whether the witness is the author of certain writings." If the Government should seek more than the physical characteristics of the witness' handwriting—if, for example, it should seek to obtain written answers to incriminating questions or a signature on an incriminating statement—then, of course, the witness could assert his Fifth Amendment privilege against compulsory self-incrimination.

of the Fourth Amendment claims of Dionisio and Mara as also without merit. I agree that no unreasonable seizure in violation of the Fourth Amendment is effected by a grand jury subpoena limited to requiring the appearance of a suspect to *testify*. But insofar as the subpoena requires a suspect's appearance in order to obtain voice or handwriting exemplars from him, I conclude, substantially in agreement with Part II of my Brother MARSHALL's dissent, that the reasonableness under the Fourth Amendment of such a seizure cannot simply be presumed. I would therefore affirm the judgments of the Court of Appeals reversing the contempt convictions and remand with directions to the District Court to afford the Government the opportunity to prove reasonableness under the standard fashioned by the Court of Appeals.

MR. JUSTICE DOUGLAS, dissenting.*

Judge William Campbell, who has been on the District Court in Chicago for over 32 years, recently made the following indictment against the grand jury: [1]

> "This great institution of the past has long ceased to be the guardian of the people for which purpose it was created at Runnymede. Today it is but a convenient tool for the prosecutor—too often used solely for publicity. Any experienced prosecutor will admit that he can indict anybody at any time for almost anything before any grand jury."

It is, indeed, common knowledge that the grand jury, having been conceived as a bulwark between the citizen and the Government, is now a tool of the Executive.

---

*This opinion applies also to No. 71–229, *United States* v. *Dionisio, ante*, p. 1.

[1] 55 F. R. D. 229, 253 (1972).

The concession by the Court that the grand jury is no longer in a realistic sense "a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor" is reason enough to affirm these judgments.

It is not uncommon for witnesses summoned to appear before the grand jury at a designated room to discover that the room is the room of the prosecutor. The cases before us today are prime examples of this perversion.

Respondent Dionisio and approximately 19 others were subpoenaed by the Special February 1971 Grand Jury for the Northern District of Illinois in an investigation of illegal gambling operations. During the investigation, the grand jury had received as exhibits voice recordings obtained under court orders, on warrants issued under 18 U. S. C. § 2518 authorizing wiretaps. The witnesses were instructed to go to the United States Attorney's office, with their own counsel if they desired, in the company of an FBI agent who had been appointed as an agent of the grand jury by its foreman, and to read the transcript of the wire interception. The readings were recorded. The grand jury then compared the voices taken from the wiretap and the witnesses' record. Dionisio refused to make the voice exemplars on the ground they would violate his rights under the Fourth and Fifth Amendments. The Government filed petitions in the United States District Court for the Northern District of Illinois to compel the witness to furnish the exemplars to the grand jury. The court rejected the constitutional arguments of the respondent and demanded compliance. Dionisio again refused and was adjudged in civil contempt and placed in prison until he obeyed the court order or until the term of the special grand jury expired. The Court of Appeals reversed, concluding that to compel compliance would violate his Fourth Amendment rights. It held that voice exemplars are protected by the Constitution from un-

reasonable seizures and that the Government failed to show the reasonableness of its actions.

The Special September 1971 Grand Jury, also in the Northern District of Illinois, was convened to investigate thefts of interstate shipments of goods that occurred in the State. Respondent Mara was subpoenaed and was requested to submit a sample of his handwriting before the grand jury. Mara refused. The Government went to the District Court for the Northern District of Illinois, asserting to the court that the handwriting exemplars were "essential and necessary" to the investigation. In an *in camera* proceeding, the Court held that the witness must comply with the request of the grand jury. The Court of Appeals reversed on the basis of its decision in *In re Dionisio*. It outlined the procedures the Government must follow in cases of this kind. First, the hearing to determine the constitutionality of the seizure must be held in open court in an adversary manner. Substantially, the Government must show that the grand jury was properly authorized to investigate a matter that Congress had power to regulate, that the information sought was relevant to the inquiry, and that the grand jury's request for exemplars was adequate, but not excessive, for the purposes of the relevant inquiry.

Today, the majority overrules this reasoned opinion of the Seventh Circuit.

Under the Fourth Amendment, law enforcement officers may not compel the production of evidence, absent a showing of the reasonableness of the seizure. *Davis* v. *Mississippi,* 394 U. S. 721; *Boyd* v. *United States,* 116 U. S. 616. The test protects the person's expectation of privacy over the thing. We said in *Katz* v. *United States,* "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth

Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U. S. 347, 351–352. The Government asserts that handwriting and voice exemplars do not invade the privacy of an individual when taken because they are physical characteristics that are exposed to the public. It argues that, unless the person involved is a recluse, these characteristics are not meant to be private to the individual and thus do not qualify for the aid of the Fourth Amendment.

This Court has held that fingerprints are subject to the requirements of the Search and Seizure Clause of the Fourth Amendment, *Davis* v. *Mississippi, supra.* On the other hand, facial scars, birthmarks, and other facial features have been said to be "in plain view" and not protected. *United States* v. *Doe (Schwartz)*, 457 F. 2d 895.

In *Davis,* the sheriff in Mississippi rounded up 24 blacks when a rape victim described her assailant only as a young Negro. Each was fingerprinted and then released. Davis was presented to the victim but was not identified. He was jailed without probable cause, and only later did the FBI confirm that his fingerprints matched those on the window of the victim's home. The Court held that the fingerprints could not be admitted, as they were seized without reasonable grounds. "Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' " *Davis* v. *Mississippi, supra,* at 726–727. The dragnet effect in *Dionisio,* where approximately 20 people were subpoenaed

for purposes of identification, was just the kind of invasion that the *Davis* case sought to prevent. Facial features can be presented to the public regardless of the cooperation or compulsion of the owner of the features. But to get the exemplars, the individual must be involved. So, although a person's handwriting is used in everyday life and speech is the vehicle of normal social intercourse, when these personal characteristics are sought for purposes of identification, the Government enters the zone of privacy and, in my view, must make a showing of reasonableness before seizures may be made.

The Government contends that since the production was before the grand jury, a different standard of constitutional law exists because the grand jury has broad investigatory powers. *Blair* v. *United States,* 250 U. S. 273. Cf. *United States* v. *Bryan,* 339 U. S. 323. The Government concedes that the Fourth Amendment applies to the grand jury and prevents it from executing subpoenas *duces tecum* that are overly broad. *Hale* v. *Henkel,* 201 U. S. 43, 76. It asserts, however, that that is the limit of its application. But the Fourth Amendment is not so limited, as this Court has held in *Davis, supra,* and reiterated in *Terry* v. *Ohio,* 392 U. S. 1, where it held that the Amendment comes into effect whether or not there is a fullblown search. The essential purpose is to extend its protection "wherever an individual may harbor a reasonable 'expectation of privacy.'" *Id.,* at 9.

Just as the nature of the Amendment rebels against the limits that the Government seeks to impose on its coverage, so does the nature of the grand jury itself. It was secured at Runnymede from King John as a cornerstone of the liberty of the people. It was to serve as a buffer between the state and the offender. For no matter how obnoxious a person may be, the United States cannot prosecute for a felony without an indict-

ment. The individual is therefore protected by a body of his peers who have no axes to grind or any Government agency to serve. It is the only accusatorial body of the Federal Government recognized by the Constitution. "The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." [2] *Stirone* v. *United States,* 361 U. S. 212, 218. But here, as the Court of Appeals said, "It is evident that the grand jury is seeking to obtain the voice exemplars of the witnesses by the use of its subpoena powers because probable cause did not exist for their arrest or for some other, less unusual, method of compelling the production of the exemplars." *In re Dionisio,* 442 F. 2d 276, 280. See

---

[2] As Mr. Justice Black said in *In re Groban,* 352 U. S. 330, 346–347:

"The traditional English and American grand jury is composed of 12 to 23 members selected from the general citizenry of the locality where the alleged crime was committed. They bring into the grand jury room the experience, knowledge and viewpoint of all sections of the community. They have no axes to grind and are not charged personally with the administration of the law. No one of them is a prosecuting attorney or law-enforcement officer ferreting out crime. It would be very difficult for officers of the state seriously to abuse or deceive a witness in the presence of the grand jury. Similarly the presence of the jurors offers a substantial safeguard against the officers' misrepresentation, unintentional or otherwise, of the witness' statements and conduct before the grand jury. The witness can call on the grand jurors if need be for their normally unbiased testimony as to what occurred before them."

Although that excerpt is from a dissent on the particular facts of the case, there could be no disagreement as to the accuracy of the description of the grand jury's historical function.

The tendency is for government to use shortcuts in its search for instruments more susceptible to its manipulation than is the historic grand jury. See *Hannah* v. *Larche,* 363 U. S. 420, 505 (DOUGLAS, J., dissenting); *Jenkins* v. *McKeithen,* 395 U. S. 411.

*Hannah* v. *Larche,* 363 U. S. 420, 497–499 (DOUG-LAS, J., dissenting). Are we to stand still and watch the prosecution evade its own constitutional restrictions on its powers by turning the grand jury into its agent? Are we to allow the Government to usurp powers that were granted to the people by the Magna Carta and codified in our Constitution? That will be the result of the majority opinion unless we continue to apply to the grand jury the protection of the Fourth Amendment.

As the Court stated in *Hale* v. *Henkel,* 201 U. S., at 59, "the most valuable function of ·the grand jury" was "to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will."

The Court held in that case that the Fourth Amendment was applicable to grand jury proceedings and that a sweeping, all-inclusive subpoena was "equally indefensible as a search warrant would be if couched in similar terms." *Id.,* at 77.

Of course, the grand jury can require people to testify. *Hale* v. *Henkel* makes plain that proceedings before the grand jury do not carry all of the impedimenta of a trial before a petit jury. To date, the grand jury cases have involved only testimonial evidence. To say, as the Government suggests, that nontestimonial evidence is free from any restraint imposed by the Fourth Amendment is to give those who today manipulate grand juries vast and uncontrollable power.

The Executive, acting through a prosecutor, could not have obtained these exemplars as it chose, for as stated by the Court of Appeals for the Eighth Circuit, "We conclude that the taking of the handwriting exemplars . . . was a search and seizure under the Fourth Amendment." *United States* v. *Harris,* 453 F. 2d 1317, 1319. As *Katz* v. *United States, supra,* makes plain, the searches that may be made without prior approval by judge or magis-

trate are "subject only to a few specifically established and well-delineated exceptions." 389 U. S., at 357.

The showing required by the Court of Appeals in the *Mara* case was that the Government's showing of need for the exemplars be "reasonable," which "is not necessarily synonymous with probable cause." 454 F. 2d 580, 584. When we come to grand juries, probable cause in the strict Fourth Amendment meaning of the term does not have in it the same ingredients pointing toward guilt as it does in the arrest and trial of people. In terms of probable cause in the setting of the grand jury, the question is whether the exemplar sought is in some way connected with the suspected criminal activity under investigation. Certainly less than that showing would permit the Fourth Amendment to be robbed of all of its vitality.

In the *Mara* case, the prosecutor submitted to the District Court an affidavit of a Government investigator stating the need for the exemplar based on his investigation. The District Court passed on the matter *in camera*, not showing the affidavit to either respondent or his counsel. The Court of Appeals, relying on *Alderman* v. *United States*, 394 U. S. 165, 183, held that in such cases there should be an adversary proceeding. 454 F. 2d, at 582–583. If "reasonable cause" is to play any function in curbing the executive appetite to manipulate grand juries, there must be an opportunity for a showing that there was no "reasonable cause." As we stated in *Alderman:* "Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth

Amendment exclusionary rule demands." 394 U. S., at 184.

The District Court in the *Dionisio* case went part way by allowing the witness to have his counsel present when the voice exemplars were prepared in the prosecutor's office. 442 F. 2d, at 278. The Court of Appeals acted in a traditionally fair way when it ruled that the reasonableness of a prosecutor's request for exemplars be put down for an adversary hearing before the District Court. It would be a travesty of justice to allow the prosecutor to do under the cloak of the grand jury what he could not do on his own.

In view of the disposition which I would make of these cases, I need not reach the Fifth Amendment question. But lest there be any doubt as to where I stand, I adhere to my position in *United States* v. *Wade,* 388 U. S. 218, 243 (separate statement), and in *Schmerber* v. *California,* 384 U. S. 757, 773 (Black, J., dissenting, joined by DOUGLAS, J.), 778 (DOUGLAS, J., dissenting), to the effect that the Fifth Amendment is not restricted to testimonial compulsion.

MR. JUSTICE MARSHALL, dissenting.*

I

The Court considers *United States* v. *Wade,* 388 U. S. 218, 221–223 (1967), and *Gilbert* v. *California,* 388 U. S. 263, 265–267 (1967), dispositive of respondent Dionisio's contention that compelled production of a voice exemplar would violate his Fifth Amendment privilege against compulsory self-incrimination. Respondent Mara also argued below that compelled production of the handwriting and printing exemplars sought from him would

---

*This opinion applies also to No. 71–229, *United States* v. *Dionisio, ante,* p. 1.

violate his Fifth Amendment privilege. I assume the Court would consider *Wade* and *Gilbert* to be dispositive of that claim as well.[1] The Court reads those cases as holding that voice and handwriting exemplars may be sought for the exclusive purpose of measuring "the physical properties" of the witness' voice or handwriting without running afoul of the Fifth Amendment privilege. *Ante,* at 7. Such identification evidence is not within the purview of the Fifth Amendment, the Court says, for, at least since *Schmerber* v. *California,* 384 U. S. 757, 764 (1966), it has been clear that while "the privilege is a bar against compelling 'communications' or 'testimony,' . . . compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

I was not a Member of this Court when *Wade* and *Gilbert* were decided. Had I been, I would have found it most difficult to join those decisions insofar as they dealt with the Fifth Amendment privilege. Since, as I discuss in Part II, I consider the Fourth Amendment to require affirmance of the decisions below in these cases, I need not rely at this time upon the Fifth Amendment privilege. Nevertheless, I feel constrained to express here at least my serious reservations concerning the Fifth Amendment portions of *Wade* and *Gilbert,* since those decisions are so central to the Court's result today.

The root of my difficulty with *Wade* and *Gilbert* is the testimonial evidence limitation that has been imposed upon the Fifth Amendment privilege in the decisions of this Court. That limitation is at odds with

---

[1] Before this Court, respondent Mara has argued only that the Government may be seeking the handwriting exemplars to obtain not merely identification evidence, but incriminating "testimonial" evidence. I certainly agree with the Court that if respondent's contention proves correct, he will be entitled to assert his Fifth Amendment privilege.

what I have always understood to be the function of the privilege. I would, of course, include testimonial evidence within the privilege, but I have grave difficulty drawing a line there. For I cannot accept the notion that the Government can compel a man to cooperate affirmatively in securing incriminating evidence when that evidence could not be obtained without the cooperation of the suspect. Indeed, until *Wade* and *Gilbert,* the Court had never carried the testimonial limitation so far as to allow law enforcement officials to enlist an individual's overt assistance—that is, to enlist his will—in incriminating himself. And I remain unable to discern any substantial constitutional footing on which to rest that limitation on the reach of the privilege.

Certainly it is difficult to draw very much support for the testimonial limitation from the language of the Amendment itself. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." Nowhere is the privilege explicitly restricted to testimonial evidence. To read such a limitation into the privilege through its reference to "witness" is just the sort of crabbed construction of the provision that this Court has long eschewed. Thus, some 80 years ago the Court rejected the contention that a grand jury witness could not invoke the privilege because it applied, in terms, only in a "criminal case." *Counselman* v. *Hitchcock,* 142 U. S. 547, 562 (1892). The Court emphasized that the privilege "is as broad as the mischief against which it seeks to guard." *Ibid.* Even earlier, the Court, in holding that the privilege could be invoked in the context of a civil forfeiture proceeding, had warned that:

> "[C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation

of the right, as if it consisted more in sound than in substance." *Boyd* v. *United States,* 116 U. S. 616, 635 (1886).

Moreover, *Boyd* itself, which involved a subpoena directed at private papers, makes clear that "witness" is not to be restricted to the act of giving oral testimony against oneself. Rather, that decision suggests what I believe to be the most reasonable construction of the protection afforded by the privilege, namely, protection against being "compell[ed] . . . to furnish evidence against" oneself, *id.,* at 637. See also *Schmerber* v. *California,* 384 U. S., at 776–777 (Black, J., dissenting).

Such a construction is dictated by the purpose of the privilege. In part, of course, the privilege derives from the view that certain forms of compelled evidence are inherently unreliable. See, *e. g., In re Gault,* 387 U. S. 1, 47 (1967). But the privilege—as a constitutional guarantee subject to invocation by the individual—is obviously far more than a rule concerned simply with the probative force of certain evidence. Its roots "tap the basic stream of religious and political principle [and reflect] the limits of the individual's attornment to the state . . . ." *Ibid.* Its "constitutional foundation . . . is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load' . . . , to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda* v. *Arizona,* 384 U. S. 436, 460 (1966). Cf. also *Rogers* v. *Richmond,* 365 U. S. 534, 540–541 (1961). It is only by prohibiting the Government from compelling an individual to cooperate

affirmatively in securing incriminating evidence which could not be obtained without his active assistance, that "the inviolability of the human personality" is assured. In my view, the testimonial limitation on the privilege simply fails to take account of this purpose.

The root of the testimonial limitation seems to be Mr. Justice Holmes' opinion for the Court in *Holt* v. *United States*, 218 U. S. 245 (1910). In *Holt*, the defendant challenged the admission at trial of certain testimony that a blouse belonged to the defendant. A witness testified that defendant put on the blouse and that it fitted him. The defendant argued that this testimony violated his Fifth Amendment privilege because he had acted under duress. In the course of disposing of the defendant's argument, Mr. Justice Holmes said that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Id.*, at 252–253. This remark can only be considered dictum, however, for the case arose before this Court established the rule that illegally seized evidence may not be admitted in federal court, see *Weeks* v. *United States*, 232 U. S. 383 (1914), and thus Holt's claim of privilege was ultimately disposed of simply on the ground that "when [a man] is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent. *Adams* v. *New York*, 192 U. S. 585." 218 U. S., at 253.

With its decision in *Schmerber*, however, the Court elevated the dictum of *Holt* to full constitutional stature. Mr. Justice Holmes' language was central to the Court's conclusion that the taking of a blood sample, over the objection of the individual, to determine alcoholic content was not barred by the Fifth Amendment privilege since

the resulting blood test evidence "was neither [the individual's] testimony nor evidence relating to some communicative act . . . ." 384 U. S., at 765. Indeed, the Court appeared to consider it established since *Holt* that the Fifth Amendment privilege extended only to " 'testimony' " or " 'communications,' " but not to " 'real or physical evidence,' " *id.*, at 764; and this "established" principle was sufficient, for the Court, to dispose of any "loose dicta" in *Miranda* that might suggest a more extensive purpose for the privilege.

After *Schmerber, Wade* and *Gilbert* were relatively easy steps for a Court focusing exclusively on the nature of the evidence compelled. Thus, the Court indicated that "compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber," was "no different from compelling Schmerber to provide a blood sample or Holt to wear the blouse." 388 U. S., at 222. Similarly, in *Gilbert,* 388 U. S., at 266–267, the Court reasoned that "[a] mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the privilege's] protection."

Yet, if we look beyond the testimonial limitation, *Wade* and *Gilbert* clearly were not direct and easy extensions of *Schmerber* and *Holt.* For it is only in *Wade* and *Gilbert* that the Court, for the first time, held in effect that an individual could be compelled to give to the State evidence against himself which could be secured only through his affirmative cooperation—that is, "to accuse himself by a volitional act which differs only in degree from compelling him to act out the crime," *Wade v. United States,* 388 U. S., at 261 (Fortas, J., concurring in part and dissenting in part). The voice and handwriting samples sought in *Wade* and *Gilbert* simply could not be obtained without the individ-

ual's active cooperation. *Holt* and *Schmerber* were certainly not such cases. In those instances the individual was required, at most, to submit passively to a blood test or to the fitting of a shirt. Whatever the reasoning of those decisions, I do not understand them to involve the sort of interference with an individual's personality and will that the Fifth Amendment privilege was intended to prevent. To be sure, in situations such as those presented in *Holt* and *Schmerber* the individual may resist and be physically subdued, and in that sense, compulsion may be employed. Or, alternatively, the individual in those situations may elect to yield to the threat of contempt and cooperate affirmatively with his accusers, thus eliminating the need for force and, in that sense, his will may be subverted. But in neither case is the intrusion on an individual's dignity the same or as severe as the affront that occurs when the state secures from him incriminating evidence that can be obtained *only* by enlisting the cooperation of his will. Thus, I do not necessarily consider the results in *Holt* and *Schmerber* to be inconsistent with the purpose and proper reach of the Fifth Amendment privilege.[2]

But so long as we have a Constitution which protects at all costs the integrity of individual volition against subordinating state power, *Wade* and *Gilbert* must be viewed as legal anomalies. As Mr. Justice Fortas, joined by MR. JUSTICE DOUGLAS and the Chief Justice, argued on the day those cases were decided:

"Our history and tradition teach and command that an accused may stand mute. The privilege means just that; not less than that. According to the

---

[2] This is not to say that, apart from the Fifth Amendment privilege, there might not be serious due process problems with physical compulsion applied to an individual's person to secure identifying evidence against his will. Cf. *Rochin* v. *California*, 342 U. S. 165 (1952). But cf. *Breithaupt* v. *Abram*, 352 U. S. 432 (1957).

Court, an accused may be jailed—indefinitely—until he is willing to say, for an identifying audience, whatever was said in the course of the commission of the crime. Presumably this would include, 'Your money or your life'—or perhaps, words of assault in a rape case. This is intolerable under our constitutional system." *United States* v. *Wade,* 388 U. S., at 260.

See also *Gilbert* v. *California,* 388 U. S., at 291–292 (Fortas, J., concurring in part and dissenting in part).

I fear the Court's decisions today are further illustrations of the extent to which the Court has gone astray in defining the reach of the Fifth Amendment privilege and has lost touch with the Constitution's concern for the "inviolability of the human personality." In both these cases, the Government seeks to secure possibly incriminating evidence that can be acquired only with respondents' affirmative cooperation. Thus, even if I did not consider the Fourth Amendment to require affirmance of the decisions of the Court of Appeals, I would nevertheless find it extremely difficult to accept a reversal of those decisions in the face of what seems to me the proper construction of the Fifth Amendment privilege.

## II

The Court concludes that the exemplars sought from the respondents are not protected by the Fourth Amendment because respondents have surrendered their expectation of privacy with respect to voice and handwriting by knowingly exposing these to the public, see *Katz* v. *United States,* 389 U. S. 347, 351 (1967). But, even accepting this conclusion, it does not follow that the investigatory seizures of respondents, accomplished through the use of subpoenas ordering them to appear before the grand jury—and thereby necessarily interfer-

ing with their personal liberty—are outside the protection of the Fourth Amendment. To the majority, though, "[i]t is clear that a subpoena to appear before a grand jury is not a 'seizure' in the Fourth Amendment sense, even though that summons may be inconvenient or burdensome." *Ante,* at 9. With due respect, I find nothing "clear" about so sweeping an assertion.

There can be no question that investigatory seizures effected by the police are subject to the constraints of the Fourth and Fourteenth Amendments. In *Davis* v. *Mississippi,* 394 U. S. 721, 727 (1969), the Court observed that only the Term before, in *Terry* v. *Ohio,* 392 U. S. 1, 19 (1968), it had rejected "the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.'" As a result, the Court held in *Davis* that investigatory seizures for the purpose of obtaining fingerprints are subject to the Fourth Amendment even though fingerprints themselves are not protected by that Amendment.[3] The Court now seems to distinguish *Davis* from the present cases, in part, on the ground that in *Davis* the authorities engaged in a lawless dragnet of a large number of Negro youths. Certainly, the peculiarly offensive exercise of investigatory powers in *Davis* heightened the Court's sensitivity to the dangers inherent in Mississippi's argument that the Fourth Amendment was not applicable to investigatory seizures. But the presence of a dragnet was not the constitutional determinant there; rather, it was police interference with the petitioner's own liberty that brought the Fourth and Four-

---

[3] We left open the further question whether such an investigatory seizure might, under certain circumstances, be made on information insufficient to establish probable cause to arrest. See 394 U. S., at 727–728.

teenth Amendments into play, as should be evident from the Court's substantial reliance on *Terry,* which involved no dragnet.

Like *Davis,* the present cases involve official investigatory seizures that interfere with personal liberty. The Court considers dispositive, however, the fact that the seizures were effected by the grand jury, rather than the police. I cannot agree.

First, in *Hale* v. *Henkel,* 201 U. S. 43, 76 (1906), the Court held that a subpoena *duces tecum* ordering "the production of books and papers [before a grand jury] may constitute an unreasonable search and seizure within the Fourth Amendment," and on the particular facts of the case, it concluded that the subpoena was "far too sweeping in its terms to be regarded as reasonable." Considered alone, *Hale* would certainly seem to carry a strong implication that a subpoena compelling an individual's personal appearance before a grand jury, like a subpoena ordering the production of private papers, is subject to the Fourth Amendment standard of reasonableness. The protection of the Fourth Amendment is not, after all, limited to personal "papers," but extends also to "persons," "houses," and "effects." It would seem a strange hierarchy of constitutional values that would afford papers more protection from arbitrary governmental intrusion than people.

The Court, however, offers two interrelated justifications for excepting grand jury subpoenas directed at "persons," rather than "papers," from the constraints of the Fourth Amendment. These are a "historically grounded obligation of every person to appear and give his evidence before the grand jury," *ante,* at 9–10, and the relative unintrusiveness of the grand jury subpoena on an individual's liberty.

In my view, the Court makes more of history than is justified. The Court treats the "historically grounded

obligation" which it now discerns as extending to all "evidence," whatever its character. Yet, so far as I am aware, the obligation "to appear and give evidence" has heretofore been applied by this Court only in the context of testimonial evidence, either oral or documentary. Certainly the decisions relied upon by the Court, despite some dicta, have not recognized an obligation of a broader sweep.

*Blair* v. *United States,* 250 U. S. 273, 281 (1919), indicated only that "the giving of *testimony* and the attendance upon court or grand jury in order to *testify* are public duties which every person . . . is bound to perform upon being properly summoned . . . ." (Emphasis added.) Similarly, just last Term, the Court reaffirmed only that "[t]he power of government to compel persons to *testify* in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence"—nothing more. *Kastigar* v. *United States,* 406 U. S. 441, 443 (1972) (emphasis added). And, Mr. Chief Justice Hughes described "one of the duties which the citizen owes to his government" to be that of "attending its courts and giving his *testimony* whenever he is properly summoned. . . ." *Blackmer* v. *United States,* 284 U. S. 421, 438 (1932). (Emphasis added.) In short, history, at least insofar as heretofore reflected in this Court's cases, does not necessarily establish an obligation to appear before a grand jury for other than testimonial purposes. See *Branzburg* v. *Hayes,* 408 U. S. 665 (1972); *Ullmann* v. *United States,* 350 U. S. 422, 439 n. 15 (1956); *Piemonte* v. *United States,* 367 U. S. 556, 559 n. 2 (1961); *Wilson* v. *United States,* 221 U. S. 361, 372 (1911); *Hale* v. *Henkel,* 201 U. S., at 65. See also *United States* v. *Bryan,* 339 U. S. 323, 331 (1950); *Brown* v. *Walker,* 161 U. S. 591, 600 (1896); *Garland* v. *Torre,* 259 F. 2d 545, 549 (CA2), cert. denied, 358 U. S. 910 (1958).

In the present cases—as the Court itself argues in its discussion of the Fifth Amendment privilege—it was not testimony that the grand juries sought from respondents, but physical evidence. The Court glosses over this important distinction from its prior decisions, however, by artificially bifurcating its analysis of what is taking place in these cases—that is, by effectively treating what is done with individuals once they are before the grand jury as irrelevant in determining what safeguards are to govern the procedures by which they are initially compelled to appear. Nonetheless, the fact remains that the historic exception to which the Court resorts is not necessarily as broad as the context in which it is now employed. Hence, I believe that the question we must consider is whether an extension of that exception is warranted, and if so, under what conditions.

In approaching these questions, we must keep in mind that "[t]his Court has consistently asserted that the rights of privacy and personal security protected by the Fourth Amendment '. . . are to be regarded as of the very essence of constitutional liberty . . . .' " *Harris* v. *United States,* 331 U. S. 145, 150 (1947). As a rule, the Amendment stands as an essential bulwark against arbitrary and unreasonable governmental intrusion— whatever its form, whatever its purpose, see, *e. g., Camara* v. *Municipal Court,* 387 U. S. 523 (1967)—upon the privacy and liberty of the individual, see, *e. g., Terry* v. *Ohio,.* 392 U. S., at 9; *Jones* v. *United States,* 362 U. S. 257, 261 (1960). Given the central role of the Fourth Amendment in our scheme of constitutional liberty, we should not casually assume that governmental action which may result in interference with individual liberty is excepted from its requirements. Cf. *Coolidge* v. *New Hampshire,* 403 U. S. 443, 455 (1971); *Katz* v. *United States,* 389 U. S., at 357; *Camara* v. *Municipal Court, supra,* at 528–529. The reason for any exception

to the coverage of the Amendment must be fully understood and the limits of the exception should be defined accordingly. To do otherwise would create a danger of turning the exception into the rule and lead to the "impairment of the rights for the protection of which [the Amendment] was adopted," *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344, 357 (1931); cf. *Grau* v. *United States,* 287 U. S. 124, 128 (1932).

The Court seems to reason that the exception to the Fourth Amendment for grand jury subpoenas directed at persons is justified by the relative unintrusiveness of the grand jury process on an individual's liberty. The Court, adopting Chief Judge Friendly's analysis in *United States* v. *Doe (Schwartz),* 457 F. 2d 895, 898 (CA2 1972), suggests that arrests or even investigatory "stops" are inimical to personal liberty because they may involve the use of force; they may be carried out in demeaning circumstances; and at least an arrest may yield the social stigma of a record. By contrast, we are told, a grand jury subpoena is a simple legal process that is served in an unoffensive manner; it results in no stigma; and a convenient time for appearance may always be arranged. The Court would have us believe, in short, that, unlike an arrest or an investigatory "stop," a grand jury subpoena entails little more inconvenience than a visit to an old friend. Common sense and practical experience indicate otherwise.

It may be that service of a grand jury subpoena does not involve the same potential for momentary embarrassment as does an arrest or investigatory "stop." [4] But this difference seems inconsequential in comparison to the substantial stigma that—contrary to the Court's assertion—may result from a grand jury appearance as well as from an arrest or investigatory seizure. Public

---

[4] But cf. *Davis* v. *Mississippi,* 394 U. S. 721, 727 (1969).

knowledge that a man has been summoned by a federal grand jury investigating, for instance, organized criminal activity can mean loss of friends, irreparable injury to business, and tremendous pressures on one's family life. Whatever nice legal distinctions may be drawn between police and prosecutor, on the one hand, and the grand jury, on the other, the public often treats an appearance before a grand jury as tantamount to a visit to the station house. Indeed, the former is frequently more damaging than the latter, for a grand jury appearance has an air of far greater gravity than a brief visit "downtown" for a "talk." The Fourth Amendment was placed in our Bill of Rights to protect the individual citizen from such potentially disruptive governmental intrusion into his private life unless conducted reasonably and with sufficient cause.

Nor do I believe that the constitutional problems inherent in such governmental interference with an individual's person are substantially alleviated because one may seek to appear at a "convenient time." In *Davis* v. *Mississippi,* 394 U. S., at 727, it was recognized that an investigatory detention effected by the police "need not come unexpectedly or at an inconvenient time." But this fact did not suggest to the Court that the Fourth Amendment was inapplicable; it was considered to affect, at most, the type of showing a State would have to make to justify constitutionally such a detention. *Ibid.* No matter how considerate a grand jury may be in arranging for an individual's appearance, the basic fact·remains that his liberty has been officially restrained for some period of time. In terms of its effect on the individual, this restraint does not differ meaningfully from the restraint imposed on a suspect compelled to visit the police station house. Thus, the nature of the intrusion on personal liberty caused by a grand jury subpoena cannot, without more, be considered sufficient basis for denying

respondents the protection of the Fourth Amendment.

Of course, the Fourth Amendment does not bar all official seizures of the person, but only those that are unreasonable and are without sufficient cause. With this in mind, it is possible, at least, to explain, if not justify, the failure to apply the protection of the Fourth Amendment to grand jury subpoenas requiring individuals to appear and *testify*. Thus, while it is true that we have traditionally given the grand jury broad investigatory powers, particularly in terms of compelling the appearance of persons before it, see, *e. g., Branzburg* v. *Hayes,* 408 U. S., at 688, 701–702; *Blair* v. *United States,* 250 U. S., at 282, it must be understood that we have done so in heavy reliance on certain essential assumptions.

Certainly the most celebrated function of the grand jury is to stand between the government and the citizen and thus to protect the latter from harassment and unfounded prosecution. See, *e. g., Wood* v. *Georgia,* 370 U. S. 375, 390 (1962); *Hoffman* v. *United States,* 341 U. S. 479, 485 (1951); *Ex parte Bain,* 121 U. S. 1, 11 (1887). The grand jury does not shed those characteristics that give it insulating qualities when it acts in its investigative capacity. Properly functioning, the grand jury is to be the servant of neither the Government nor the courts, but of the people. *Hale* v. *Henkel,* 201 U. S., at 61. As such, we assume that it comes to its task without bias or self-interest. Unlike the prosecutor or policeman, it has no election to win or executive appointment to keep. The anticipated neutrality of the grand jury, even when acting in its investigative capacity, may perhaps be relied upon to prevent unwarranted interference with the lives of private citizens and to ensure that the grand jury's subpoena powers over the person are exercised in only a reasonable fashion. Under such circumstances, it may be justifiable to give the grand jury broad personal subpoena powers that are outside the purview

of the Fourth Amendment, for—in contrast to the police—it is not likely that it will abuse those powers.[5] Cf. *Costello* v. *United States,* 350 U. S. 359, 362 (1956); *Stirone* v. *United States,* 361 U. S. 212, 218 (1960).

Whatever the present day validity of the historical assumption of neutrality that underlies the grand jury process,[6] it must at least be recognized that if a grand jury is deprived of the independence essential to the assumption of neutrality—if it effectively surrenders that independence to a prosecutor—the dangers of excessive and unreasonable official interference with personal liberty are exactly those that the Fourth Amendment was intended to prevent. So long as the grand jury carries on its investigatory activities only through the mechanism of testimonial inquiries, the danger of such official usurpation of the grand jury process may not be unreasonably great. Individuals called to testify before the grand jury will have available their Fifth Amendment privilege against self-incrimination. Thus, at least insofar as incriminating information is sought directly from a particular criminal suspect,[7] the grand jury process would not appear to offer law enforcement officials a substantial advantage over ordinary investigative techniques.

---

[5] When the grand jury does overstep its power and acts maliciously, courts are certainly not totally without power to control it. See n. 9, *infra.*

[6] Indeed, the Court today acknowledges that "[t]he grand jury may not always serve its historic role as a protective bulwark." *Ante,* at 17.

[7] Of course, the grand jury does provide an important mechanism for investigating possible criminal activity through witnesses who may have first-hand knowledge of the activities of others. But, given the Fifth Amendment privilege, it does not follow that the grand jury is a useful mechanism for securing incriminating testimony from the suspect himself.

But when we move beyond the realm of a grand jury investigation limited to testimonial inquiries, as the Court does today, the danger increases that law enforcement officials may seek to usurp the grand jury process for the purpose of securing incriminating evidence from a particular suspect through the simple expedient of a subpoena. In view of the Court's Fourth Amendment analysis of the respondents' expectations of privacy concerning their handwriting and voice exemplars, and in view of the testimonial evidence limitation on the reach of the Fifth Amendment privilege, there is essentially no objection to be made once a suspect is before the grand jury and exemplars are requested. Thus, if the grand jury may summon criminal suspects for such purposes without complying with the Fourth Amendment, it will obviously present an attractive investigative tool to prosecutor and police. For what law enforcement officers could not accomplish directly themselves after our decision in *Davis* v. *Mississippi,* they may now accomplish indirectly through the grand jury process.

Thus, the Court's decisions today can serve only to encourage prosecutorial exploitation of the grand jury process, at the expense of both individual liberty and the traditional neutrality of the grand jury. Indeed, by holding that the grand jury's power to subpoena these respondents for the purpose of obtaining exemplars is completely outside the purview of the Fourth Amendment, the Court fails to appreciate the essential difference between real and testimonial evidence in the context of these cases, and thereby hastens the reduction of the grand jury into simply another investigative device of law enforcement officials. By contrast, the Court of Appeals, in proper recognition of these dangers, imposed narrow limitations on the subpoena power of the grand jury that are necessary to guard against unreasonable

48

official interference with individual liberty but that would not impair significantly the traditional investigatory powers of that body.

The Court of Appeals in *Mara,* No. 71–850, did not impose a requirement that the Government establish probable cause to support a grand jury's request for exemplars. It correctly recognized that "examination of witnesses by a grand jury need not be preceded by a formal charge against a particular individual," since the very purpose of the grand jury process is to ascertain probable cause, see, *e. g., Blair* v. *United States,* 250 U. S., at 282; *Hendricks* v. *United States,* 223 U. S. 178, 184 (1912). 454 F. 2d 580, 584. Consistent with this Court's decision in *Hale* v. *Henkel,* the Court of Appeals ruled only that the request for physical evidence such as exemplars should be subject to a showing of reasonableness. See 201 U. S., at 76. This "reasonableness" requirement has previously been explained by this Court, albeit in a somewhat different context, to require a showing by the Government that: (1) "the investigation is authorized by Congress"; (2) the investigation "is for a purpose Congress can order"; (3) the evidence sought is "relevant"; and (4) the request is "adequate, but not excessive, for the purposes of the relevant inquiry." See *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 209 (1946). This was the interpretation of the "reasonableness" requirement properly adopted by the Court of Appeals. See 454 F. 2d, at 584–585. And, in elaborating on the requirement that the request not be "excessive," it added that the Government would bear the burden of showing that it was not conducting "a general fishing expedition under grand jury sponsorship." *Id.,* at 585.

These are not burdensome limitations to impose on the grand jury when it seeks to secure physical evidence,

such as exemplars, that has traditionally been gathered directly by law enforcement officials. The essence of the requirement would be nothing more than a showing that the evidence sought is relevant to the purpose of the investigation and that the particular grand jury is not the subject of prosecutorial abuse—a showing that the Government should have little difficulty making, unless it is in fact acting improperly. Nor would the requirement interfere with the power of the grand jury to call witnesses before it, to take their testimony, and to ascertain their knowledge concerning criminal activity. It would only discourage prosecutorial abuse of the grand jury process.[8] The "reasonableness" requirement would do no more in the context of these cases than the Constitution compels—protect the citizen from unreasonable and arbitrary governmental interference, and ensure that the broad subpoena powers of the grand jury which

---

[8] It is, of course, true that a suspect may be called for the dual purposes of testifying and obtaining physical evidence. Obviously, his liberty would be interfered with merely as a result of appearing and testifying, a situation in which the Fourth Amendment has not heretofore been applied. But it does not follow that the application of the Fourth Amendment is inappropriate when a suspect is subpoenaed for these dual purposes. The application of the Fourth Amendment is necessary to discourage unreasonable use of the grand jury process by law enforcement officials. While the Fifth Amendment privilege at least contributes to that goal in the context of a subpoena intended to secure both testimonial and physical evidence, it is essential also to apply the Fourth Amendment when the suspect is requested to give physical evidence. Otherwise, subpoenaing suspects for the purpose of testifying would provide a simple guise by which law enforcement officials might secure physical evidence without complying with the Fourth Amendment, and thus the deterrent effect on such officials sought by applying the Amendment to grand jury subpoenas seeking physical evidence would be lost.

the Court now recognizes are not turned into a tool of prosecutorial oppression.[9]

In *Dionisio,* No. 71–229, the Government has never made any showing that would establish the "reasonableness" of the grand jury's request for a voice sample. In *Mara,* No. 71–850, the Government submitted an affidavit to the District Court to justify the request for the handwriting and printing exemplars. But it was not sufficient to meet the requirements set down by the Court of Appeals. See 454 F. 2d, at 584–585. Moreover, the affidavit in *Mara* was reviewed by the District Court *in camera* in the absence of respondent Mara and his counsel. Such *ex parte* procedures should be the exception, not the rule.

> "Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth Amendment . . . demands."[10]
> *Alderman* v. *United States,* 394 U. S. 165, 184 (1969).

---

[9] It may be that my differences with the Court are not as great as may first appear, for despite the Court's rejection of the applicability of the Fourth Amendment to grand jury subpoenas directed at "persons," it clearly recognizes that abuse of the grand jury process is not outside a court's control. See *ante,* at 11–12. Besides the Fourth Amendment, the First Amendment and both the Due Process Clause and the privilege against compulsory self-incrimination contained in the Fifth Amendment erect substantial barriers to "the transformation of the grand jury into an instrument of oppression." *Ante,* at 12. See also *Hale* v. *Henkel,* 201 U. S., at 65; *United States* v. *Doe (Schwartz),* 457 F. 2d 895, 899.

[10] As the Court of Appeals observed:

"[D]ifficulties of locating a suspect or possessor of evidence, the problems of apprehension, the destructibility of evidence, the need for promptness to protect the public against violence and to prevent

See also *Dennis* v. *United States,* 384 U. S. 855, 873–875 (1966). Consequently, I agree with the Court of Appeals that the reasonableness of a request for an exemplar should be tested in an adversary context.[11]

I would, therefore, affirm the Court of Appeals' decisions reversing the judgments of contempt against respondents and order the cases remanded to the District Court to allow the Government an opportunity to make the requisite showing of "reasonableness" in each case. To do less is to invite the very sort of unreasonable governmental intrusion on individual liberty that the Fourth Amendment was intended to prevent.

---

repetition of criminal conduct necessitate the *ex parte* nature of the warrant issuance proceeding." 454 F. 2d 580, 583.

But these considerations do not apply in the context of a grand jury request for exemplars. Nevertheless, the Government contends that the traditional secrecy of the grand jury process dictates that any preliminary showing required of it should be made in an *ex parte,* *in camera* proceeding. However, the interests served by the secrecy of the grand jury process can be adequately protected without such a drastic measure. *Id.,* at 584.

[11] The Court suggests that any sort of showing that might be required of the Government in cases such as these "would saddle a grand jury with minitrials" and "would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *Ante,* at 17. But constitutional rights cannot be sacrificed simply for expedition and simplicity in the administration of the criminal laws. Moreover, a requirement that the Government establish the "reasonableness" of the request for an exemplar would hardly be so burdensome as the Court suggests. As matters stand, if the suspect resists the request, the Government must seek a judicial order directing that he comply with the request. Thus, a formal judicial proceeding is already necessary. The question whether the request is "reasonable" would simply be one further matter to consider in such a proceeding.