**UNITED STATES of America, Plaintiff,**

v.

**Kevin INGRAM, Defendant.**

**Civ. No. LR–CR–92–112.**

United States District Court,
E.D. Arkansas, W.D.

June 12, 1992.

Robert L. Scull, Robert L. Scull & Associates, Little Rock, Ark., for Kevin Ingram.

Michael D. Johnson, U.S. Attys. Office, Little Rock, Ark., for U.S.

## ORDER

EISELE, District Judge.

### I

On April 20, 1992, a grand jury returned a three count indictment charging the defendant, Kevin Ingram, and a co-defendant with conspiring to rob and then robbing two banks in Little Rock, Arkansas on December 16, 1991. Little Rock law enforcement officers placed Mr. Ingram under arrest on April 4, 1992. He remained in State custody until he was released to federal authorities, pursuant to a writ of habeas corpus ad prosequendum, for a plea and arraignment hearing held on April 22, 1992. After entering a plea of not guilty, Mr. Ingram posted bond and was released from federal custody.

The government has submitted a Motion for Production of Physical Evidence, in which it requests the Court to order the defendant to appear at the United States Attorney's Office so that hair samples may be taken from his head. The motion states that "[t]his sample is necessary to compare with hair fibers from the coat worn[ ] dur-

ing the robbery for which the defendant has been charged." The defendant has opposed this motion, arguing that an order to produce hair samples would violate his rights under the Fourth and Fifth Amendments to the United States Constitution.

The government does not argue that it has made any showing of cause to believe, or even to suspect, that the hair fibers found on the coat will match those it wishes to take from Mr. Ingram. In fact, the government does not even represent that it has formed such an expectation, let alone set forth its reasons for having done so. The motion is not accompanied by evidence or affidavits, and the government is not seeking a warrant. So, the Motion for Production of Physical Evidence raises the question: Does the Fourth Amendment permit the issuance of an order compelling an individual, who has been charged with a crime and released on bail pending trial, to appear so that the government may take hair samples, absent any showing of a reason to believe that the samples will connect the individual to the crime with which he is charged?

For the reasons set forth below, the Court answers this question in the negative and will deny the government's motion.

## II

### A. THE DEFENDANT'S FIFTH AMENDMENT OBJECTION

As a preliminary matter, the Court finds no merit in the defendant's Fifth Amendment objection. While the defendant does not explain which Fifth Amendment right is at stake here, or why the taking of a hair sample would violate that right, the Court can only surmise that he is talking about due process or self-incrimination.

■ In *Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952), the Supreme Court held that the due process clause prohibits the introduc-

tion of evidence that the state recovers by subjecting someone to a type of physical examination that "shocks the conscience" or "offend[s] a sense of justice." *Rochin* involved the forcible pumping of a suspect's stomach. The forcible combing or plucking of a suspect's hair is hardly comparable. The examination the government wants to conduct here involves no more than what people often do in their rear view mirror. Unlike the stomach pumping discussed in *Rochin,* taking a hair sample would not "offend even hardened sensibilities" or elicit comparison to "the rack and screw". *Id.* at 172, 72 S.Ct. at 209. The Court perceives no possibility of a due process violation from the production of physical evidence at issue here.

■ Any self-incrimination argument that Mr. Ingram might make is foreclosed by *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), where the Supreme Court held that the privilege against self-incrimination bars the state from compelling "testimony" or "communication," but does not extend to "that compulsion which makes a suspect or accused the source of 'real or physical evidence'" such as a blood test. *Id.* 86 S.Ct. at 1832.

### B. THE DEFENDANT'S FOURTH AMENDMENT OBJECTION.

#### 1. *First Principles*

The defendant's Fourth Amendment objection requires much more careful consideration. The Fourth Amendment provides, in relevant part: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...."

In addressing Fourth Amendment questions, courts must consider the threshold question of whether a "search" or "seizure" has occurred.[1] The Supreme Court

---

**1.** A detention for the purpose of taking a hair sample may involve both a seizure and a search. Compelling Mr. Ingram to appear and submit to hair sampling may constitute a seizure, and the government certainly intends to seize a sample of his hair. However, most of the cases ad-

dressing similar questions focus their inquiry on whether the recovery of physical evidence constitutes a "search." *See, e.g., Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (collection and testing of urine viewed as a search, not a

has explained that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). A more difficult question concerns the meaning of the term "search". In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)—a decision that represented a significant change in Fourth Amendment jurisprudence and created a new starting point for this type of analysis—the Supreme Court defined a search as state action that "violate[s] the privacy on which an individual justifiably relied". Justice Harlan, in his *Katz* concurrence, formulated this definition in a way that was soon adopted by lower courts and then, in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), by a majority of the Supreme Court. According to Harlan, a search must meet "a twofold requirement, first, that a person have exhibited an actual (subjective) expectation of privacy, and, second, that the expectation be one that society is prepared to accept as 'reasonable.'" *Katz*, 88 S.Ct. at 516 (Harlan, J., concurring).

▮ If the challenged state action does not amount to a search or seizure, then it is outside the scope of Fourth Amendment protection, and the inquiry is over. If the Fourth Amendment does apply, however, the Court then asks whether the search or seizure was a "reasonable" one. Tradition-

ally, that determination turns on whether the state has satisfied the warrant requirement. "Except in certain well-defined circumstances, a search or seizure ... is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Skinner*, 109 S.Ct. at 1414. Absent "well-defined" or "exigent" circumstances, the strongest showing of probable cause fails to justify an already completed search. As Justice Jackson observed in *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948),

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity....

The facts of this case do not suggest the presence of exigent circumstances that would permit a warrantless search. Therefore, those exceptions to the warrant requirement are not at issue here.[2]

seizure of urine); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (drawing blood viewed as Fourth Amendment search, not a seizure of blood); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (handwriting sample not a search, grand jury subpoena not a seizure); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (scrapings from finger nails product of search).

**2.** In recent years, the Supreme Court has demonstrated its willingness to look past the warrant requirement "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirement impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (search of probationer's home). *See also, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105

S.Ct. 733, 748, 83 L.Ed.2d 720 (1985) (search of students' property by school officials); *Skinner*, 109 S.Ct. at 1414 (regulations requiring railroad crew members involved in accidents to undergo blood and urine testing). In these so-called "special needs" cases, the Supreme Court has determined the reasonableness of a search by balancing the government's interests in bypassing the warrant requirement against the potential for intruding on the individual's Fourth Amendment interests. *Skinner*, 109 S.Ct. at 1414–16. In this case, the Court does not perceive the presence of "special needs beyond the normal need for law enforcement." Instead, the government's motion involves the ordinary but important need to convict those guilty of criminal conduct without violating individuals' constitutional rights.

In addition to the "well-defined" exceptions to the warrant requirement, the Court has, on occasion, held that certain forms of "lesser intrusions" should not be subjected to the same test for reasonableness applied to typical searches or seizures. In these cases, instead of reasoning that warrantless searches are presumptively unreasonable, the Court has made an independent determination of reasonableness by balancing the state's need to conduct a given search against the invasion of the individual's privacy that the search entails. For example, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court employed a balancing test to hold that a police officer whose observations lead him to reasonably suspect that an individual is planning or engaged in criminal activity, and that the individual is armed and presently dangerous, may briefly detain the individual without a warrant to conduct a carefully limited search of the outer clothing in order to discover weapons. And in *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and its companion case *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), the Court considered the balance of interests involved in administrative inspections of residences and businesses; it concluded that while officials conducting these investigations must obtain a warrant to enter without consent, magistrates issuing such warrants may employ a significantly more liberal standard of what constitutes probable cause. The types of state action recognized as "lesser intrusions" still involve searches and seizures, and thus still are subject to Fourth Amendment scrutiny. The bottom-line determination of reasonableness, however, turns on a more case-specific balancing of interests, as compared to the presumptive rule derived from the warrant requirement.

The Court's decision concerning the government's motion must comport with these principles of Fourth Amendment law.

**2. *United States v. Weir***

Each party cites *United States v. Weir*, 657 F.2d 1005 (8th Cir.1981) (per curiam) as support for its position. *Weir* is the only Eighth Circuit case that addresses the issue of hair samples, and the Supreme Court has not decided or discussed the question. Therefore, the Court must first determine if *Weir* controls here.

The facts in *Weir* resemble those in this case, at least in several respects.[3] In that case, FBI agents investigating a bank robbery had recovered clothing, including ski masks, that, according to a confidential informant, George Weir and an individual named Davis had worn while committing the robbery. Two FBI agents went to the Story County, Iowa jail, where Weir and Davis were in custody, in order to obtain hair samples to compare to the hair found on the clothing.[4] According to the FBI agents, Weir voluntarily complied with their request. According to Weir, he only cooperated because the agents told him they would take the samples whether he liked it or not, and because he believed a refusal would lead to physical violence. In deciding the case, the Eighth Circuit assumed that Weir did not consent to the taking of his hair. The agents obtained their sample by combing and plucking hair from Weir's head, beard, and mustache.

The *Weir* court quoted *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), to set forth the applicable legal standard:

> As we begin our inquiry we note the proposition that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner."

*Schmerber*, 384 U.S. at 768 [86 S.Ct. at 1834]. Initially assuming, *arguendo*, that Weir did not consent to the taking of his hair, we must decide whether the FBI agents were justified in the first instance

---

**3.** This summary of the facts is taken from *Weir*, 657 F.2d at 1006–07.

**4.** The fact that Weir and Davis, unlike the defendant here, were in custody has significant Fourth Amendment implications. See discussion below.

in requiring Weir to give the samples, and whether the manner of taking respected reasonableness standards of the fourth amendment. *Id.*

*Weir*, 657 F.2d at 1007. The court then considered the two requirements of Fourth Amendment constitutionality that *Schmerber* described.

First, the court determined that the taking of Weir's hair was an "intrusion which [was] justified in the circumstances." Its entire discussion of this question reads as follows:

> Unquestionably, the Government had good reason to examine Weir's hair. The FBI had previously recovered clothing which, according to an informant, Weir wore in the robbery; strands of hair found on a ski mask were to be compared with Weir's hair.

*Weir*, 657 F.2d at 1007. The opinion is not encumbered with traditional Fourth Amendment terminology. "Good reason" might mean probable cause, or perhaps some lesser showing. The court was satisfied that the government had sufficiently good reason to take the hair sample—that, to quote *Schmerber*, the intrusion was "justified"—and it moved on.

*Weir* then states: "As *Schmerber* held, the mere fact of lawful arrest does not necessarily justify the intrusion beyond the body's surface.[5] It must still be determined if the search was reasonable." *Id.*

5. *Weir* does not distinguish *Schmerber* as involving an invasive physical examination—that is, "a search beyond the body's surface"—from the less intrusive form of examination required to take a hair sample.

6. According to the citation in *Weir*, *D'Amico* was decided in 1966. This is incorrect. The date should be 1969.

7. The statement *D'Amico* quotes, drawn from the Supreme Court's decisions in *Cooper* and *Rabinowitz*, seems to contradict the meaning of the warrant requirement described above. However, both those cases involve one of the "well-defined circumstances" that justify exceptions to the warrant rule.

*Rabinowitz* involved a search incident to an arrest. The decision gave that exception such expansive scope that it threatened to defeat the rule. Justice Frankfurter's *Rabinowitz* dissent

The opinion then notes that *United States v. D'Amico*, 408 F.2d 331 (2d Cir.1969),[6] addressed a similar question. Expanding the quote that appears in *Weir*, *D'Amico* states:

> Th[e] holding [in *Schmerber*] does not comprehend that all official intrusions into an individual's person require, in the absence of extenuating circumstances, a search warrant in order to be reasonable. Some official in-custody investigative techniques designed to uncover incriminating evidence from a person's body are such minor intrusions into or upon the "integrity of an individual's person" ([*Schmerber*], 384 U.S. at 772 [86 S.Ct. at 1836]) that they are not, in the absence of a search warrant, unreasonable intrusions. " 'The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was unreasonable.' *United States v. Rabinowitz*, 339 U.S. 56, 66 [70 S.Ct. 430, 435, 94 L.Ed. 653] (1950)." *Cooper v. California*, 386 U.S. 58 [87 S.Ct. 788, 17 L.Ed.2d 730] (1967).[7]

Here there was only the slightest intrusion (if indeed there was any intrusion at all): the clipping by the officer of the few strands of hair from appellant's head was so minor an imposition that appellant suffered no true humiliation or affront to his dignity. We hold that a search warrant was not required to justify the officer's act.

is the most noteworthy and thankfully, the most lasting feature of the decision. In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court stated:
> *Rabinowitz* and *Harris [v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399] have been the subject of critical commentary for many years, and have been relied upon less and less in our own decisions. It is time, for the reasons we have stated, to hold that on their own facts, and insofar as the principles they stand for are inconsistent with those that we have endorsed today, they are no longer to be followed.
*Id.* 89 S.Ct. at 2042–43. Reliance on *Rabinowitz*, like that in the passage in *D'Amico* quoted in *Weir*, should stand out as a caution signal to courts in search of sound authority. Even within its exception, *Rabinowitz* is bad law.

*Cooper* involved an automobile search, another "exigent circumstance" exception to the warrant requirement.

We fail to see how the taking of several strands of appellant's hair from his head while the appellant was in custody was in any way more prejudicial or offensive than the taking of his fingerprints or his photograph. The seizure which occurred in this case was not an unreasonable one or one violative of the Fourth Amendment.

*D'Amico*, 408 F.2d at 333 (footnote omitted). The *Weir* court never states the principle it draws from *D'Amico*. It merely notes the similarity between the facts of that case and the one before it, and it quotes a portion of the passage set forth above.

After summarizing *D'Amico*, *Weir* distinguishes *Bouse v. Bussey*, 573 F.2d 548 (9th Cir.1977) (per curiam). In *Bouse*, the appellant was detained pending trial on a charge of rape. He was taken to a small holding cell, where a police officer demanded that Bouse provide a pubic hair sample. When he refused to comply, he was wrestled to the floor by two officers, one of whom then "allegedly unzipped appellant's jail uniform and forcibly pulled a sample of pubic hair from appellant's person." *Id.* at 550. The Ninth Circuit stated,

It is true that some investigative procedures designed to obtain incriminating evidence from the person are such minor intrusions upon privacy and integrity that they are not generally considered searches or seizures subject to the safeguards of the Fourth Amendment. We cannot, however, characterize the intrusion allegedly perpetrated by the police in this case as minor. It was sufficiently severe to constitute a search. The search of the appellant's person "went beyond the mere 'physical characteristics ... constantly exposed to the public,' and constituted the type of 'severe, though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny. *Cupp v. Murphy*, 412 U.S. 291, 295 [93 S.Ct. 2000, 2003, 36 L.Ed.2d 900] (1973) (citation omitted).

*Id.* (ellipsis in original). According to *Weir*, *Bouse* "rested on its circumstances, which were far more egregious than those here." *Weir*, 657 F.2d at 1007. *Weir*'s treatment of *Bouse* is similar to its treatment of *D'Amico*, in that it does not follow its factual comparison with a substantive conclusion. According to *Weir*, *D'Amico* is similar and *Bouse* is different; but *Weir* does not disclose the principles for which either case stands.

After summarizing *D'Amico* and *Bouse*, *Weir* announces its conclusion: "Because the intrusion upon Weir's person was so minor, even if it could be said that he did not consent to the search and seizure, fourth amendment rights were not implicated." *Id.* That statement ends the court's discussion of the Fourth Amendment question raised by a non-consensual taking of a hair sample.

*Weir* is a troubling decision for several reasons. Justice Frankfurter made several memorable statements in his dissenting opinion in *United States v. Rabinowitz*, supra note 7, one of which reads as follows: "It is true also of journeys in the law that the place you reach depends on the direction you are taking. And so, where one comes out on a case depends on where one goes in." 339 U.S. at 69, 70 S.Ct. at 436. *Weir* goes in at *Schmerber v. California*—the case from which it draws the applicable legal standard. But *Schmerber* was not the correct place to start. The Eighth Circuit should have began as the Ninth Circuit did in *Bouse:* with the question of whether the challenged state action constituted a search or seizure under the Fourth Amendment. Since 1967, the line of cases addressing that question has begun with *United States v. Katz*. (*Schmerber* was decided in 1966.) *Weir* seems to overlook the controlling body of law. It goes in badly, and it comes out badly.

*Weir*'s troubles, however, cannot be attributed to its reliance on *Schmerber*, at least not entirely. *Schmerber* would probably have been worded differently if it had been decided after *Katz;* nonetheless, it is consistent with *Katz* and the cases following *Katz*, and its place in Fourth Amendment law remains secure. Unlike *Weir*, *Schmerber* employs a traditional Fourth Amendment analysis. First, *Schmerber* concluded that the procedures used to take

and test a person's blood "plainly constitute searches of "persons," and depend antecedently upon seizures of "persons," within the meaning of the Fourth Amendment. *Schmerber,* 86 S.Ct. at 1834. *Schmerber* then properly turns to the warrant requirement in determining whether the search was reasonable. A warrant, the Court observed, would ordinarily be required before conducting intrusions into the body; the officers there would have had no trouble showing probable cause, but that determination would normally have to be made by a magistrate. *Id.* at 1835. As the Court recognized, "The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Id.* The Court ultimately approved the warrantless intrusion in *Schmerber,* however, because exigent circumstances foreclosed the possibility of recovering the evidence after a warrant could be obtained. In light of the "special facts" requiring immediacy, the Court concluded that the search in *Schmerber* was "an appropriate incident to [the suspect's] arrest." *Id.* at 1836. Thus, after deciding a search had occurred, the *Schmerber* Court openly recognized the importance of the warrant requirement, and only approved the state's conduct because it fit within an established exception to the general rule.

If the *Weir* court wanted to follow *Schmerber,* it should have followed it more closely. The Eighth Circuit never clearly addressed the question of whether the taking of a hair sample constituted a search; it merely concluded that "[u]nquestionably, the Government had good reason to examine Weir's hair." 657 F.2d at 1007. Moreover, *Weir* pays little if any attention to the warrant requirement; in 'fact, the word "warrant" only appears once in the opinion—in the passage quoted from *D'Amico.* Of the cases *Weir* cites, the one that illustrates the proper approach to this type of question is *Bouse v. Bussey,* the 1977 Ninth Circuit decision that *Weir* distinguishes. *Bouse* first determined that a search had occurred. Then it considered whether circumstances justified conducting the search without a warrant, and determined that they did not. The Eighth Circuit did not have to reach the same conclusions, but *Bouse*—more than *Schmerber,* and more than *D'Amico* [8]—demonstrated a correct understanding of the legal principles that *Weir* should have applied.

■ *Weir's* conclusion is the most problematic aspect of the decision. Again, it states: "Because the intrusion upon Weir's person was so minor, even if it could be said that he did not consent to the search and seizure, fourth amendment rights were not implicated." *Weir,* 657 F.2d at 1007. The case thus seems to hold that a "search and seizure" did in fact occur—but only a very minor search and seizure—so that "fourth amendment rights were not implicated." Under current Fourth Amendment law, Fourth Amendment rights are always implicated whenever a search or seizure takes place. Some investigative procedures—such as taking a voice or handwriting sample, or a photograph—are so unintrusive that an individual's claimed privacy interest is not one society is prepared to recognize as reasonable; in such cases, courts have held that no search has occurred, and that therefore the challenged state action is not regulated by the Fourth Amendment. *See United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (voice sample not a search); *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (handwriting sample not a search). However, even minor searches and seizures require Fourth Amendment scrutiny. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) the Supreme Court held that a police officer whose observations lead him to reasonably suspect that an individual is engaged in criminal activity, and that the individual is armed and presently dangerous, may briefly detain the individual without a warrant to conduct a carefully limited

---

**8.** *D'Amico,* like *Weir,* is a very brief per curiam decision. It is hardly a model of legal reasoning, but it shows a greater awareness of traditional Fourth Amendment principles than *Weir* does.

search of the outer clothing in order to discover weapons which might pose a danger to the officer or others in the area. The Court recognized that this "stop-and-frisk" encounter involves both a "search" and a "seizure," and it therefore emphatically rejected "the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.'" *Terry*, 392 U.S. at 19, 88 S.Ct. at 1879. However, in light of the lesser intrusions suffered by those stopped and frisked, as well as the need for and utility of these brief on-the-spot detentions, the Court has not required police to obtain warrants or show probable cause to justify this type of activity. A lesser showing of cause—that is, "reasonable suspicion" based on specific observations—made after the fact, is sufficient. The important point here is that lesser intrusions might require lesser justifications, but so long as they amount to even limited searches or seizures, the Fourth Amendment applies to regulate their occurrence.

*Weir* fails to appreciate that principle. It holds that a minor intrusion, something it in fact views as a search and seizure, does not raise Fourth Amendment implications. The decision does not follow a stop-and-comb (or stop-and-pluck) type of approach. It is a significant departure from basic tenets of Fourth Amendment law. As such, in this Court's view, *Weir* merits careful reconsideration.

Of course, regardless of any misgivings about *Weir*, the Court would accept and follow that decision if it controlled here. However, a significant factual difference distinguishes *Weir* from the case presently before the Court. Recall that in *Weir*, the defendant from whom the hair sample was taken was in State custody. Mr. Ingram, however, has been released on bail. Because *Weir* would have to be extended to reach these facts, and because the Court believes that *Weir* should not be read so broadly, that precedent will not control the Court's decision.

The facts of this case are not simply different from those in *Weir*; they are different in a legally important way. At least since the Supreme Court's decision in *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Fourth Amendment rights of suspects who are held in custody following a lawful arrest have been significantly limited. *Edwards* extended the rule permitting searches "incident to arrest" to include searches conducted after a suspect was placed in custody at a jail. As the Court stated, "It is [ ] plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *Edwards*, 94 S.Ct. at 1237. And the previous term, in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Supreme Court held that police officers, upon making a lawful custodial arrest, could search the arrestee without having a reasonable belief that the arrestee was armed or in possession of evidence of the crime for which he was arrested. Thus *Edwards*, together with *Robinson*, meant that individuals, upon being lawfully taken into custody, gave up most of their Fourth Amendment rights. As one leading commentator has summarized the resulting group of decisions,

> [O]n incident-to-arrest grounds, it has been held that at the station the police may search through the arrestee's pockets, wallet, other containers on the person, and even underclothing, may require the arrestee to strip, and may seize incriminating objects thereby revealed. It is not necessary that there be advance probable cause that such objects will be found. Indeed, it may be said more generally that the courts assume that this search may be just as extensive as could have been made under *Robinson* at the scene of the custodial arrest, and this is so even where the arrestee's access to the object searched was terminated between the time of arrest and the time of the search.

LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, vol. 2, § 5.3(a)

at 479–80 (1987 and 1992 Supp.) (cited below as "LaFave").

And under *Edwards* and the cases following it, a suspect held in custody does not regain Fourth Amendment protection after being searched on arrival at the station house. Later searches may be permissible without the need for a warrant or even a later showing of probable cause. As the Supreme Court stated,

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*Edwards*, 94 S.Ct. at 1239. *See also United States v. Phillips*, 607 F.2d 808 (8th Cir.1979) (relying on *Edwards* to permit introduction of evidence recovered from search of wallet; wallet had been taken from defendant, later placed in envelope and delivered to FBI agent, and later searched outside presence of defendant).

*Edwards* involved the searching of an arrestee's clothing and personal effects, and the Court's opinion leaves some question as to whether physical examinations should be treated differently. In a footnote, the Court commented:

> Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints.... We thus have no occasion to express a view concerning those circumstances surrounding custodial searches incident to incarceration which might "violate the dictates of reason either because of their number or their manner of perpetration."

*Edwards*, 94 S.Ct. at 1239 n. 9 (quoting *Charles v. United States*, 278 F.2d 386, 389 (9th Cir.), *cert. denied*, 364 U.S. 831, 81 S.Ct. 46, 5 L.Ed.2d 59 (1960)). The Court followed this qualification with a citation to *Rochin* and *Schmerber*. Lower courts,

however, have permitted the police to subject individuals held in custody to a variety of warrantless physical examinations:

> Among the search procedures that have been upheld are: the placing of the arrestee's hands under an ultraviolet lamp; examining the arrestee's arms to determine the age of burn marks; swabbing the arrestee's hands with a chemical substance; taking scrapings from under the arrestee's fingernails; taking a small sample of hair from the arrestee's head; [9] obtaining a urine sample from the arrestee; giving the arrestee a breathalyzer examination; swabbing the arrestee's penis; or taking pubic hair combings from him.

LaFave, vol. 2, § 5.3(c) at 499 (citations omitted). The cases reviewing these procedures are not entirely consistent in either rationale or result. They do, however, demonstrate the importance of whether a person is being held in custody in determining the scope of that person's Fourth Amendment protection from procedures used to recover physical evidence.

*D'Amico*, the Second Circuit case upon which *Weir* relied, illustrates this point. It describes the taking of a hair sample as an "*in-custody* investigative technique designed to uncover incriminating evidence from a person's body." *D'Amico*, 408 F.2d at 333 (emphasis added). And the concluding paragraph states: "We fail to see how the taking of several strands of the appellant's hair from his head *while the appellant was in custody* was in any way more prejudicial or offensive than the taking of his fingerprints or his photograph." *Id.* (emphasis added).

*United States v. Anderson*, 739 F.2d 1254 (7th Cir.1984), a case in which the Seventh Circuit discussed but did not answer the question of whether the taking of a hair sample constituted a Fourth Amendment search, contains a statement which clearly demonstrates the importance of custodial status in making this type of determination. The court stated: "It should, of course, be clear that law enforcement offi-

---

**9.** *Weir* is included among the cases LaFave cites here.

cials may not force someone to submit to hair sampling unless that person is first lawfully within the control of the government through, for example, a lawful arrest, a grand jury subpoena or the execution of a search warrant." *Id.* at 1256 n. 1. The *Anderson* court viewed the question of whether the taking of a hair sample from someone "within the lawful control of the government" constituted a search to be a controversial one that the facts of the case did not require it to answer; [10] the court considered it "clear" however, that the procedure would not be permissible absent lawful custody.

Finally, the only case in which the Eighth Circuit has cited *Weir* in connection with a Fourth Amendment question relies on the case to uphold the introduction of evidence police recovered when, after making a lawful arrest, they asked the arrestee to open his mouth; he complied, and the officers found two small baggies of crack cocaine. *United States v. Torres*, 921 F.2d 196 (8th Cir.1990). A consensual non-search incident to arrest does not pose a difficult Fourth Amendment problem. The fact remains, however, that *Weir* has not been extended beyond the custodial context.

■ Having concluded that (1) custody is a legally important fact in determining the constitutionality of obtaining physical evidence without a warrant, and (2) that *Weir* should be read to depend, at least in part, on the fact that the defendant there was in custody after a lawful arrest, the Court must finally address the question of whether Mr. Ingram, because he was lawfully arrested [11] and then released on bail, should be treated as if he were being held in a detention facility pending trial. The Court concludes that he should not.

■ In *Beightol v. Kunowski*, 486 F.2d 293 (3d Cir.1973), a defendant who had been released on bail was seized at his preliminary hearing and forcibly fingerprinted and photographed. The case thus presented the question of whether those procedures, which are broadly permissible during detention following a lawful arrest, may be as freely performed on individuals who have been arrested and charged, but then freed on bail. The Third Circuit, reversing the district court's decision to dismiss the defendant's civil rights complaint, provided the following answer:

> The district court, admitting that the complaint alleges a detention of the defendant while he was not in custody, analogized to the taking of fingerprints and photographs of persons in custody following a lawful arrest. But what Beightol complains about is an unlawful arrest. It is one thing to say that a lawful arrest can justify identification procedures. It is quite another to say that the desire to subject a person to identification procedures can justify an otherwise unauthorized arrest. *The cases on identification procedures of persons lawfully in custody do not justify the dismissal of the instant complaint unless for purposes of detention one equates bail with custody. To do so would be a distortion of the purpose of the right to bail.* The purpose is to secure the defendant's presence at his trial while at the same time affording him freedom from harassment and confinement before he has been proven guilty of the offense charged. It would be anomalous, indeed, to hold that a person long freed on bail remained subject to the control of the police, subject to warrantless seizure at any time to meet their administrative convenience.

*Id.* at 294 (emphasis added) (citations omitted). The Court agrees with *Beightol's* reasoning and holds that bail cannot be equated with custody for the purpose of determining whether an investigative procedure, like the taking of a hair sample, is permissible under the Fourth Amendment. For this reason, and for those stated above, *Weir* should be (and is hereby) distin-

---

**10.** In *Anderson,* at the suggestion of the district court, the FBI agents obtained a warrant to take the hair samples they wanted. *Id.*

**11.** Mr. Ingram has not challenged the legality of his arrest, so for the purposes of this order, the Court assumes that it was lawfully made.

guished from the case presently before the Court.

### 3. *What the government must do to take a hair sample*

Because *Weir* dealt with a hair sample taken from an individual in custody, that decision does not control here; nonetheless, the Court is not free to disregard *Weir* entirely. The precedent is obviously relevant even if it does not, by itself, answer the question this case raises. The Eighth Circuit clearly found that the taking of a hair sample is an extremely minor intrusion comparable, as the Second Circuit stated in *D'Amico*, to the taking of fingerprints. Were this Court to address the issue in *Weir*'s absence, it might not agree. Instead, it might find the removal of hair for microscopic examination to be more analogous to the taking and testing of a urine sample or a fingernail scraping—examinations the Supreme Court has viewed as searches within the scope of Fourth Amendment protection—than to the taking a voice sample, a handwriting sample, or a photograph—procedures that the Court has viewed as beyond the scope of Fourth Amendment protection. *Compare Skinner*, 109 S.Ct. 1402, 1413 (urine and blood tests are searches) and *Cupp v. Murphy*, 93 S.Ct. at 2003 (microscopic examination of fingernail scrapings is search), *with Dionisio*, 93 S.Ct. at 768, 771–72 (voice exemplar not a search) and *United States v. Mara*, 410 U.S. 19, 20–21, 93 S.Ct. 774, 775, 35 L.Ed.2d 99 (1973) (handwriting exemplar not a search).[12] However, the discussion of *Weir* above does not change, obscure, or reject the Eighth Circuit's position regarding this question. It would make little sense to hold that while taking a hair sample from a person in custody did not implicate Fourth Amendment rights, the same procedure conducted on a person not in custody constituted a full-fledged Fourth Amendment search (or seizure) that could only occur after the police obtained a warrant based on probable cause.

■ The Court concludes, therefore, that the best, most consistent way to reconcile *Weir* and the principles discussed above is to view the government's motion as a request to conduct what courts have described as a "lesser intrusion." Such intrusions clearly must be conducted within limits imposed by the Fourth Amendment. The compelled appearance at a prosecutor's office or police station to provide a hair sample constitutes a limited type of seizure, a limited type of search, or both.[13] As with the stop-and-frisk procedure approved in *Terry*, elements of both search and seizure are involved in this type of compelled procedure. The suspect's freedom is restrained, and his privacy interests are curtailed. The intrusion, however—again, like that involved in *Terry*—is a limited one. Therefore, the Court will not require the government to obtain a warrant based on probable cause before obtaining a sample of Mr. Ingram's hair.

■ Accepting the comparison between hair sampling and fingerprinting suggested by *Weir* and *D'Amico*, the Court takes guidance from the Supreme Court's comments in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969):

Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment [than the stop-and-frisk detentions approved in *Terry*]. It is arguable, however, that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional

---

12. As the Eleventh Circuit has noted, "Federal Courts are undecided as to whether the involuntary removal of hair samples constitutes a search and seizure under the Fourth Amendment." *United States v. De Parias*, 805 F.2d 1447, 1456 (11th Cir.1986) (citing conflicting cases before side-stepping question), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987).

13. Again, *Weir* does not provide a clear answer to this question. It concluded that on the one hand, the taking of Weir's hair was a "search and seizure," but on the other hand, that Mr. Weir's "fourth amendment rights were not implicated."

sense.... Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass an individual, since the police need only one set of each person's prints.... Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time. For the same reason, the general requirement that the authorization of a judicial officer be obtained in advance of detention would not seem to admit of any exception in the fingerprinting context.

*Davis*, 89 S.Ct. at 1397–98. The type of limited intrusion described in *Davis* or contemplated here is "subject to the constraints of the Fourth Amendment."[14] The nature of those constraints will be determined by the kind of balancing the Supreme Court employed in *Terry*. And like in *Terry*, given the government's need for the information it is seeking and the relatively minor invasion of privacy the individual would suffer, this balance indicates that the taking of hair samples should not require a showing of probable cause. Instead, the government will only need to show a reasonable suspicion, based upon specific and articulable facts and the inferences rationally drawn from those facts,[15] that (1) Mr. Ingram has committed a crime, and (2) that the taking of hair samples will provide evidence connecting him to the crime that he allegedly committed.

Unlike *Terry*, however, this showing of a reasonable suspicion must be made to a neutral judicial officer—either a magistrate or judge—before the sample is taken. The Court is not authorizing stop-and-comb detentions. As the Supreme Court's comments in *Davis* clearly suggest, orders to appear and submit to a relatively unintrusive examination should be "obtained in advance of detention" and should insure that "the limited detention [does] not come unexpectedly or at an inconvenient time." *Davis, supra.* While the intrusion here has been described as relatively minor, the Court recognizes that individuals subjected to the intrusion would understandably describe it differently. Judicial officers deciding whether to authorize this type of detention can and should remain sensitive to that fact. The requirement of prior judicial approval will best safeguard the individual's privacy interests without placing a significant burden on prosecutors or the court system. Therefore, the same kind of balancing employed to permit this procedure on a showing of reasonable suspicion indicates that the showing should be made in a judicial forum instead of in an officer's or prosecutor's mind.[16]

### III

Before compelling a person suspected of a crime to submit to the taking of a hair sample, the Court will require the government to show reasonable suspicion, as described above, that the suspect has committed the crime, and that the hair sample would connect the suspect to the crime he is suspected of committing. That showing will normally have to be made to a neutral judicial officer who, upon finding adequate cause, will issue an order directing the

---

**14.** The Court agrees with *Davis* that a different conclusion here would at least create a real risk that "investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention." *Davis,* 89 S.Ct. at 1397.

**15.** For the Eighth Circuit's formulation of the reasonable suspicion standard applied in *Terry*-type situations, see *United States v. Peoples,* 925 F.2d 1082 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991).

**16.** The Court might not require this prior authorization if exigent circumstances required that a suspect be detained for hair sampling before approval could be obtained. The Court has not attempted to think of how such circumstances might occur, and it does not comment on whether an *ex post* showing justifying the detention would be permitted in such a case. As a general matter, the Court thinks it fair to assume that a person's hair is not evanescent evidence.

suspect to appear and submit to the taking of a hair sample at a convenient time. Of course, the sample must also be taken in a reasonable manner, so as not to intrude unnecessarily on the suspect's personal privacy. The government has not attempted to carry this burden to obtain an order for Mr. Ingram to appear for the taking of a hair sample. It is free to make that effort.

THEREFORE, the government's Motion for Production of Physical Evidence should be, and is hereby, DENIED.