**In re GRAND JURY PROCEEDINGS NO. 92–4: John Doe No. A93–155.**

**UNITED STATES of America, Plaintiff–Appellant,**

v.

**UNDER SEAL; Under Seal, Defendants–Appellees.**

No. 93–5640.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 30, 1994.

Decided Dec. 20, 1994.

**ARGUED:** William Graham Otis, Senior Litigation Counsel, Office of the U.S. Atty., Alexandria, VA, for appellant. Nina Jean Ginsberg, Dimuro, Ginsberg & Lieberman, P.C.; J. Frederick Sinclair, Cohen, Dunn & Sinclair, P.C., Alexandria, VA, for appellees. **ON BRIEF:** Helen F. Fahey, U.S. Atty., Office of the U.S. Atty., Alexandria, VA, for appellant.

Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

Reversed by published opinion. Judge WILKINSON wrote the opinion, in which Chief Judge ERVIN and Senior Judge PHILLIPS joined.

## OPINION

WILKINSON, Circuit Judge:

This appeal concerns the enforceability of two subpoenas for attorney fee records in a grand jury probe of a cocaine distribution network. The district court quashed the subpoenas. We hold, however, that issuance of the subpoenas was within the legitimate

scope of the grand jury's power to investigate the sudden acquisition of wealth by previously indigent persons suspected of drug dealings. Accordingly, we reverse the judgment of the district court.

## I.

This dispute arises out of the issuance of two subpoenas for the fee records of criminal defense attorneys retained by apparently indigent persons under grand jury investigation in the Eastern District of Virginia. Antonio Duran and Lilliana Ruiz were among those suspected of conspiring to distribute drugs. On May 28, 1993, they were arrested in the course of collecting a $115,000 cocaine debt. Prior to his arrest, Duran was implicated in the regular collection of large cocaine debts and in the supply of multiple kilograms of cocaine.

At the time of the arrest, Duran told FBI agents that he had been largely unemployed since 1991, that he had no money, no car, or any other property, and that he did not have the funds necessary to hire an attorney. Ruiz stated that she did not have a full-time job, although she sometimes worked from her home as a travel agent. A search of Ruiz's purse uncovered records indicating that she had less than $100 in her checking account and less than $500 in her savings account. Her purse also contained a resume showing that she had been unemployed for several years, as well as current public assistance cards for four of Ruiz and Duran's children and a credit rejection letter. Accordingly, counsel was appointed to represent Duran and Ruiz.

Shortly thereafter, Duran and Ruiz discharged their appointed counsel and retained two local attorneys, as well as a third lawyer from New York. This sudden change of circumstances—two unemployed persons with no visible assets retaining private counsel and abruptly discharging their appointed attorneys—led the government to suspect that the funds used to pay the lawyers were coming from the conspiracy's leadership or from some other illicit source. Believing that the attorney fee records were the most reliable way to gain such information and to investigate other subjects of the grand jury's inquiry, the United States Attorney approved an application to the Department of Justice ("DOJ") for permission to issue the subpoenas, which DOJ granted. Subpoenas were then issued to the two local attorneys for, *inter alia,* "all fee records, including receipts for payment, all entries and references reflecting payment dates, payment amounts, and form of payments, including currency and denominations thereof ... [and] photocopies of any currency still held by the law firm or by members, partners, associates or employees of the firm." The attorneys, joined by their clients, moved to quash.

The district court granted the motion to quash the subpoenas on two grounds. First, the court found that the subpoenas had not been issued according to DOJ procedure because the government had made no request of the attorneys for voluntary compliance before issuing the subpoenas. Second, the court found that the subpoenas were issued pursuant to a policy in the United States Attorney's Office of seeking the fee records of all retained counsel in drug cases. The court concluded that these two factors sufficiently impugned the government's motives in issuing the subpoenas so as to render them unenforceable.

The government moved for reconsideration and submitted additional affidavits in support of its motion, including one by the then United States Attorney for the Eastern District of Virginia, Kenneth E. Melson. Melson's affidavit asserted that his office had no program of any sort to subpoena attorney fee records and that no such program had existed during the ten years he had worked in that office. The purpose of the Melson affidavit was to counter suggestions made by AUSA Gordon Kromberg at the hearing on the motion to quash that the routine issuance of fee record subpoenas to retained counsel in drug cases would be salutary. Part of the rationale for such a program, Mr. Kromberg stated, would be to refute charges that individual attorneys were being singled out for subpoenas of their fee records.

The district court denied the motion for reconsideration. The government now appeals.

## II.

The Supreme Court has spoken extensively on the subject of a grand jury's subpoena powers. The breadth of those powers reflects the importance of the grand jury's investigatory mission. It has been said that "[a] grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" *Branzburg v. Hayes*, 408 U.S. 665, 701, 92 S.Ct. 2646, 2667, 33 L.Ed.2d 626 (1972) (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir.1970)). Courts have been careful not to obstruct this investigative function. *See e.g., Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). As this circuit has recognized, we "should not intervene in the grand jury process absent a compelling reason." *United States v. (Under Seal)*, 714 F.2d 347, 350 (4th Cir.), *cert. dismissed*, 464 U.S. 978, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983).

On the other hand, the grand jury is not unfettered in the exercise of its investigatory powers. The law forbids it from undertaking those practices that "do not aid the grand jury in its quest for information bearing on the decision to indict." *Id.* at 349. This prohibition bars, *inter alia*, grand jury requests that amount to civil or criminal discovery, *id.* at 349, as well as arbitrary, malicious, or harassing inquiries. *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 298–300, 111 S.Ct. 722, 727, 112 L.Ed.2d 795 (1991).

■ The test for enforceability of a grand jury subpoena derives from the foregoing principles. The grand jury is under no obligation at the investigative stage to prove its case to a court of law. Rather, the dispositive question is whether there is any "reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *R. Enterprises*, 498 U.S. at 301, 111 S.Ct. at 728. The inquiry centers on the information's potential usefulness. "Once it is shown that a subpoena might aid the grand jury in its investigation, it is generally recognized that the subpoena should issue even though there is also a possibility that the prosecutor will use it for some other purpose than obtaining evidence for the grand jury." *(Under Seal)*, 714 F.2d at 350.

## III.

■ We believe there is a reasonable possibility in this case that the subpoenaed attorney fee records will be relevant to the grand jury's investigation. The sudden acquisition of funds sufficient to pay the attorney fees of Duran and Ruiz—who by their own account had exceedingly limited assets—could well illuminate both their own involvement in a cocaine distribution conspiracy as well as the involvement of other co-conspirators.

The attorney fee records, once obtained by the grand jury, might reveal that Duran and Ruiz were themselves spending relatively large amounts of money for legal representation. We have previously recognized that the unexplained expenditure of large sums, particularly in cash, is appropriate evidence that an individual is involved in illegal drug trafficking. In *United States v. Grandison*, 783 F.2d 1152 (4th Cir.), *cert. denied*, 479 U.S. 845, 107 S.Ct. 160, 93 L.Ed.2d 99 (1986), for instance, we held that evidence of a defendant's recent expenditure of large cash sums was "relevant in a narcotics prosecution as evidence of illegal dealings and ill-gotten gains," and that its relevance was "clear given the fact that [the defendant] was unemployed and only recently paroled." *Id.* at 1156; *see also United States v. Mitchell*, 733 F.2d 327, 331 (4th Cir.), *cert. denied*, 469 U.S. 1039, 105 S.Ct. 520, 83 L.Ed.2d 409 (1984) (holding that evidence of a defendant's failure to file income tax returns together with evidence of his cash purchases of automobiles was admissible in a prosecution for conspiracy to distribute heroin). Similarly, the sudden presence of large sums to pay attorney fees, despite the apparent absence of legitimate sources of income, is at least suggestive of involvement with illegal drugs. It may show, for example, the ability of an individual to collect drug debts on short notice. Simply as a matter of common sense, then, persons with virtually no assets who are suddenly able to afford a private criminal defense may

have a source of funds that is less than wholly legitimate. *See In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 248 (2d Cir.) (en banc), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986) (recognizing that "[f]ee information may be sought as evidence of unexplained wealth which may have been derived from criminal activity").

In addition, the fee records could steer the grand jury toward information regarding other possible co-conspirators. Such records might disclose the existence of a patron paying Duran and Ruiz's legal fees. That information could be relevant to the investigation of a drug conspiracy in several ways. If the benefactor is himself a known or suspected drug dealer, the fee records might establish a significant link between the suspects and their patron. Such a connection goes directly to the issue of conspiracy, or, conceivably, to the existence of a criminal enterprise under the Racketeer Influenced and Corrupt Organizations Act. *See United States v. Locascio*, 6 F.3d 924, 932–33 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d at 242 ("Evidence of . . . benefactor payments made to [defendant's attorney] might establish [defendant] as the head of 'an enterprise'. . . ."). Information regarding the payor could also help the grand jury map the power structure of a drug cartel and identify persons whose role might otherwise remain obscure.

Aside from the question of who is paying the fees, the question of how the fees are paid is also relevant to the grand jury's probe of illegal drug distribution. Whether fees are paid in cash, and, if so, the type of currency and the denominations thereof, all constitute evidence that could inform the grand jury's investigation of drug trafficking. *See generally United States v. $250,000 in United States Currency*, 808 F.2d 895, 898–99 (1st Cir.1987) (holding, in the context of forfeiture proceedings, that evidence that

cashier checks for bond were purchased with large amounts of cash in small denomination bills showed probable cause to believe the bail money derived from illegal drug transactions). In addition, photocopies of any currency tendered, as requested in the subpoenas here, may be relevant to the grand jury's decision to indict for money laundering—a charge that often arises in conjunction with drug conspiracy charges. *See e.g., United States v. Baker*, 985 F.2d 1248 (4th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994).

Appellees challenge the subpoena of the fee records by arguing that the government had the opportunity to ask Duran and Ruiz about their attorney fee arrangements when the government debriefed them. The alleged existence of an alternative means of obtaining the information is, however, insufficient to render the subpoenaed attorney fee records immaterial to the grand jury's investigation; that a source of information is not exclusive does not eviscerate the information's demonstrated relevance. Moreover, the grand jury need not simply accept a potential indictee's word regarding a matter under investigation. *R. Enterprises*, 498 U.S. at 302–04, 111 S.Ct. at 729. Even if Duran and Ruiz had volunteered fee information, the grand jury would be justified in ascertaining the truth for itself.

Whether the subpoenas will reveal incriminating evidence is at this stage speculative. Grand jury investigations, no less than other investigations, will necessarily meet deadends. The point is simply that leads cannot be foreclosed before they are pursued. The subject of the grand jury's investigation here was a cocaine distribution network in which Duran and Ruiz were thought to be involved. To contend that the sudden emergence of significant sums for the defense of these two arrestees has no bearing on this investigation is to constrict the grand jury's role in a way not countenanced by our precedent.[1]

1. Appellees did not argue, nor could they, that either the Sixth Amendment or the attorney-client privilege operate to bar subpoenas for attorney fee records. This circuit has held that the enforcement of attorney fee record subpoenas does not violate the Sixth Amendment right to counsel of choice. *See In re Grand Jury Matter*, 926 F.2d 348, 351 (4th Cir.1991) (noting that "[t]he argument that serving a subpoena on a client's attorneys violates the sixth amendment has been previously addressed and repudiated" and holding that compliance with subpoenas re-

## IV.

■ We address finally the two grounds on which the district court quashed the subpoenas in this case. First, the government's issuance of the subpoenas without first asking the attorneys to voluntarily submit their fee records, as required by DOJ guidelines, is an insufficient ground for quashing the subpoenas.[2] "A court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law." *United States v. Caceres,* 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979). The DOJ provision is plainly not in that category. As in *Caceres,* the guideline "is of the kind to be enforced internally by a governmental department, and not by courts." *In re Shain,* 978 F.2d 850, 854 (4th Cir.1992).

The district court's second concern about an indiscriminate policy to subpoena all fee records of retained counsel in drug cases is understandable. On the one hand, such a policy carries significant risks to the willingness of counsel to undertake representation in such cases. On the other hand, a defendant's inexplicable acquisition of sudden wealth poses a different set of risks—namely that counsel's advice (whether to render substantial assistance to authorities, for example) may be tendered in the interest of the third-party payor, and not in the best interest of the individual client. *See Locascio,* 6 F.3d at 932 ("[T]he acceptance of ... 'benefactor payments' 'may subject an attorney to undesirable outside influence' and raises an ethical question 'as to whether the attorney's loyalties are with the client or the payor.'") (quoting *In re Grand Jury Subpoena Served Upon Doe,* 781 F.2d at 248 n. 6). Balancing these two risks must be left to the considered discretion of district judges. Perfunctory subpoenas of fee records to uncover possible evidence of unexplained wealth may stand on a different footing from subpoenas of such records where, as here, the government has in its possession significant evidence of indigency coupled with the sudden incurrence of large expenditures to finance a private defense.

Fortunately, the district court's concern that the United States Attorney's Office was engaged in a practice of subpoenaing the fee records of all retained attorneys in drug cases has been mitigated to some extent. As an initial matter, the government has unequivocally disavowed the existence of such a policy, both in the affidavit of United States Attorney Melson and in representations before this court. The sworn Melson affidavit states that "[t]his Office has no 'program' of any description to subpoena attorney fee records and there has not been any such 'program' while I have been in this Office. Any statement or implied statement to the contrary by any member of this Office is incorrect." In its brief to this court, the government repeats that statement "without reservation." This explicit disavowal spares us the need to inquire whether any such indiscriminate policy was engendered by an improper purpose or otherwise undertaken in anything but good faith.

questing only documents relating to fee arrangements does not require attorney disqualification and thus does not violate the Sixth Amendment); *United States v. (Under Seal),* 774 F.2d 624, 627–28 (4th Cir.1985), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1514, 89 L.Ed.2d 913 (1986) ("We are unable to accept appellant's argument that compelling the disclosure of the subpoenaed [fee] documents, and thus possibly placing his attorney in the position of a witness against him, denies appellant his sixth amendment right to counsel of choice.").

This circuit has also made it clear that attorney fee record subpoenas generally do not violate the attorney-client privilege. *See In re Grand Jury Matter,* 926 F.2d at 351–52 (describing the argument that fee subpoenas violate the privilege as possessing a "dubious status" and holding that "the mere fact that [fee] arrangements 'evidence wrongdoing by the client' does not implicate the attorney-client privilege") (citation omitted); *(Under Seal),* 774 F.2d at 628 ("[T]he attorney-client privilege normally does not extend to the payment of attorney's fees and expenses."); *see also United States v. Ricks,* 776 F.2d 455, 465 (4th Cir.1985), *aff'd on reh'g,* 802 F.2d 731 (4th Cir.) (en banc), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986); *In re Grand Jury Proceedings,* 727 F.2d 1352 (4th Cir.1984).

2. The United States Attorneys' Manual provides that "[a]ll reasonable attempts shall be made to voluntarily obtain information from an attorney before issuing a subpoena to an attorney for information relating to the representation of a client." United States Attorneys' Manual, § 9–2.161(a)(C).

Thus the inquiry may now focus on whether the subpoenas in this case can fairly be said to have issued with the reasonable prospect that relevant evidence would be obtained. Individual motions to quash can be judged, as they properly should be judged, according to that standard. Here two persons, who held no jobs, owned no property, and had scant assets, suddenly dismissed their appointed counsel and acquired three retained attorneys. In seeking to investigate this matter, the grand jury issued subpoenas that in this case met the appropriate standard of relevance. For the reasons expressed herein, we order the enforcement of those subpoenas. The judgment of the district court is

*REVERSED.*