SENTELLE, Circuit Judge.
An investigative reporter for the New York Times; the White House correspondent for the weekly news magazine Time; and Time, Inc., the publisher of Time, appeal from orders of the District Court for the District of Columbia finding all three appellants in civil contempt for refusing to give evidence in response to grand jury subpoenas served by Special Counsel Patrick J. Fitzgerald. Appellants assert, that the information concealed by them, specifically the identity of confidential sources, is protected by a reporter’s privilege arising from the First Amendment, or failing that, by federal common law privilege. The District Court held that neither the First Amendment nor the federal common law provides protection for journalists’ confidential sources in the context of a grand jury investigation. For the reasons set forth below, we agree with the District Court that there is no First Amendment privilege protecting the evidence sought. We further conclude that if any such common law privilege exists, it is not absolute, and in this case has been overcome by the filings of the Special Counsel with the District Court. We further conclude that other assignments of error raised by appellants are without merit. We therefore affirm the decision of the District Court.
I. Background
According to the briefs and record before us, the controversy giving rise to this litigation began with a political and news media controversy over a sixteen-word sentence in the State of the Union Address of President George W. Bush on January 28, 2003. In that address, President Bush stated: “The British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa.” The ensuing public contro *15 versy focused not on the British source of the alleged information, but rather on the accuracy of the proposition that Saddam Hussein had sought uranium, a key ingredient in the development of nuclear weaponry, from Africa. Many publications on the subject followed. On July 6, 2003, the New York Times published an op-ed piece by former Ambassador Joseph Wilson, in which he claimed to have been sent to Niger in 2002 by the Central Intelligence Agency (“CIA”) in response to inquiries from Vice President Cheney to investigate whether Iraq had been seeking to purchase uranium from Niger. Wilson claimed that he had conducted the requested investigation and reported on his return that there was no credible evidence that any such effort had been made.
On July 14, 2003, columnist Robert Novak published a column in the Chicago Sun-Times in which he asserted that the decision to send Wilson to Niger had been made “routinely without Director George Tenet’s knowledge,” and, most significant to the present litigation, that “two senior administration officials” told him that Wilson’s selection was at the suggestion of Wilson’s wife, Valerie Píame, whom Novak described as a CIA “operative on weapons of mass destruction.” Robert Novak, The Mission to Niger, Chi. Sun-Times, July 14, 2003, at 31. After Novak’s column was published, various media accounts reported that other reporters had been told by government officials that Wilson’s wife worked at the CIA monitoring weapons of mass destruction, and that she was involved in her husband’s selection for the mission to Niger. One such article, published by Time.com on July 17, 2003, was authored in part by appellant Matthew Cooper. That article stated that:
Some government officials have noted to Time in interviews ... that Wilson’s wife, Valerie Píame, is a CIA official who monitors the proliferation of weapons of mass destruction ... [and] have suggested that she was involved in the husband’s being dispatched to Niger to investigate reports that Saddam Hussein’s government had sought to purchase large quantities of uranium ore ....
Matthew Cooper et ah, A War on Wilson?, Time.com, at http://www.time.com/tvme/nation/aHicle/0.8599.165270.00.html (Dec. 13, 2004). Other media accounts reported that “two top White House officials called at least six Washington journalists and disclosed the identity and occupation of Wilson’s wife.” Mike Allen & Dana Priest, Bush Administration is Focus of Inquiry; CIA Agent’s Identity was Leaked to Media, Wash. Post, Sept. 28, 2003, at Al. The Department of Justice undertook an investigation into whether government employees had violated federal law by the unauthorized disclosure of the identity of a CIA agent. See, e.g., 50 U.S.C. § 421 (criminalizing, inter alia, disclosure of the identity of a covert agent by anyone having had authorized access to classified information). As the investigation proceeded, in December of 2003, the Attorney General recused himself from participation and delegated his full authority in the investigation to the Deputy Attorney General as Acting Attorney General. The Deputy, in turn, appointed Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, as Special Counsel and delegated full authority concerning the investigation to him. As part of the ongoing investigation, a grand jury investigation began in January of 2004.
In cooperation with Special Counsel Fitzgerald, the grand jury conducted an extensive investigation. On May 21, 2004, a grand jury subpoena was issued to appellant Matthew Cooper, seeking testimony and documents related to two specific articles dated July 17, 2003, and July 21, 2003, to which Cooper had contributed. Cooper refused to comply with the subpoena, even after the Special Counsel offered *16 to narrow its scope to cover only conversations between Cooper and a specific individual identified by the Special Counsel. Instead, Cooper moved to quash the subpoena on June 3, 2004. On July 6, 2004, the Chief Judge of the United States District Court for the District of Columbia denied Cooper’s motion in open court, and confirmed the denial with reasoning set forth in a written order issued on July 20, 2004.
A further grand jury subpoena was issued to Time, Inc., seeking the same documents requested in the subpoena to Cooper. Time also moved to quash its subpoena. On August 6, 2004, the District Court denied Time’s motion. Both Cooper and Time refused to comply with the subpoenas despite the District Court’s denial of their motions to quash. The District Court thereafter found that Cooper and Time had refused to comply with the subpoenas without just cause and held them in civil contempt of court. After both Cooper and Time had filed appeals, and further negotiations between Special Counsel and the two had proceeded, Cooper agreed to provide testimony and documents relevant to a specific source who had stated that he had no objection to their release. Cooper and Time fulfilled their obligations under the agreement, the Special Counsel moved to vacate the District Court’s contempt order, and the notices of appeal were voluntarily dismissed.
On September 13, 2004, the grand jury issued a further subpoena to Cooper seeking “[a]ny and all documents ... [relating to] conversations between Matthew Cooper and official souree(s) prior to July 14, 2003, concerning in any way: former Ambassador Joseph Wilson; the 2002 trip by former Ambassador Wilson to Niger; Valerie Wilson Píame, a/k/a Valerie Wilson, a/k/a Valerie Píame (the wife of former Ambassador Wilson); and/or any affiliation between Valerie Wilson Píame and the CIA.” An August 2, 2004 subpoena to Time requested “[a]ll notes, tape recordings, emails, or other documents of Matthew Cooper relating to the July 17, 2003 Time.com article entitled ‘A War on Wilson?’ and the July 21, 2003 Time Magazine article entitled, ‘A Question of Trust.’ ” Cooper and Time again moved to quash the subpoenas, and on October 7, 2004, the District Court denied the motion. The two refused to comply with the subpoenas, and on October 13, 2004, the District Court held that their refusal was without just cause and held both in contempt.
In the meantime, on August 12 and August 14, grand jury subpoenas were issued to Judith Miller, seeking documents and testimony related to conversations between her and a specified government official “occurring from on or about July 6, 2003, to on or about July 13, 2003, ... concerning Valerie Piame Wilson (whether referred to by name or by description as the wife of Ambassador Wilson) or concerning Iraqi efforts to obtain uranium.” Miller refused to comply with the subpoenas and moved to quash them. The District Court denied Miller’s motion to quash. Thereafter, the court found that Miller had refused to comply without just cause and held her in civil contempt of court also. She also has appealed.
The appellants have proceeded with common counsel and common briefing in a consolidated proceeding before this court. They assert four theories for reversal. Their first claim is that the First Amendment affords journalists a constitutional right to conceal their confidential sources even against the subpoenas of grand juries. Secondly, they claim that reporters enjoy an evidentiary privilege under the common law to conceal confidential sources. Adjunct to this claim, while denying that the privilege is less than abso *17 lute, they argue that if the privilege is in fact qualified, the United States has not overcome the privilege. Thirdly, appellants argue that their due process rights were violated by the Special Counsel’s ex parte and in camera submission of evidence to the court to establish that the United States had overcome any qualified privilege. Finally, they argue that the Special Counsel failed to comply with Department of Justice guidelines for the issuance of subpoenas to journalists, and that the failure to comply is an independent ground for reversal of their contempt conviction. Finding no grounds for relief under the First Amendment, due process clause, or Department of Justice guidelines, and persuaded that any common law privilege that exists would be overcome in this case, we affirm the judgment of the District Court for the reasons set out more fully below.
II. Analysis
A. The First Amendment Claim
In his opinion below, the Chief District Judge held that “a reporter called to testify before a grand jury regarding confidential information enjoys no First Amendment protection.” In Re Special Counsel Investigation, 332 F.Supp.2d 26, 31 (D.D.C.2004). Appellants argue that “this proposition of law is flatly contrary to the great weight of authority in this and other circuits.” Appellants are wrong. The governing authority in this case, as the District Court correctly held, comes not from this or any other circuit, but the Supreme Court of the United States. In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Highest Court considered and rejected the same claim of First Amendment privilege on facts materially indistinguishable from those at bar.
Like the present case, Branzburg was a consolidated proceeding involving multiple contempt proceedings against news media defendants. The named petitioner, Branzburg, had been held in contempt in two related proceedings, arising from one extended task of investigative journalism. The first arose from an article published by his employer, a daily newspaper, describing his observation of two Kentucky residents synthesizing hashish from marijuana as part of a profitable illegal drug operation. The article included a photograph “of hands working above a laboratory table on ... a substance identified ... as hashish.” 408 U.S. at 667, 92 S.Ct. 2646. A Kentucky grand jury subpoenaed the journalist who “refused to identify the individuals he had seen possessing marihuana or the persons he had seen making hashish from marihuana.” Id. at 668, 92 S.Ct. 2646. Branzburg claimed privilege both under the First Amendment of the United States Constitution and various state statutory and constitutional provisions. He was held in contempt and the proceeding eventually made its way to the Supreme Court.
The second case involving petitioner Branzburg arose out of a later article published by the same newspaper describing the use of drugs in Frankfort, Kentucky. According to the article, this publication was the product of two weeks spent interviewing drug users in the area. The article further reported that its author had seen some of his sources smoking marijuana. The article related numerous conversations with and observations of unnamed drug users. Branzburg was again subpoenaed to appear before a Kentucky grand jury “to testify in the matter of violation of statutes concerning use and sale of drugs,” id. at 669, 92 S.Ct. 2646 (internal quotation marks omitted). Branzburg moved to quash the subpoena. The motion was denied. The journalist sought the protection of the Kentucky Court of Appeals by way of mandamus and prohibition, claiming *18 “that if he were forced to go before the grand jury or to answer questions regarding the identity of informants or disclose information given him in confidence, his effectiveness as a reporter would be greatly damaged.” Id. at 670, 92 S.Ct. 2646. The Kentucky courts rejected Branzburg’s claim of a First Amendment privilege. Again, he petitioned for certiorari in the Supreme Court.
The consolidated petitions in Branzburg also included In re Pappas. Petitioner Pappas was a television newsman-photographer for a Massachusetts television station. On July 30, 1970, during a time of civil unrest in New Bedford, Massachusetts, he gained entrance to the headquarters of the Black Panther Party, upon his agreement not to disclose anything he saw or heard inside the headquarters. Subsequently, he was subpoenaed to appear before a Massachusetts grand jury. Although he appeared and answered other questions, he refused to answer any questions about what had taken place inside the Black Panther headquarters, “claiming that the First Amendment afforded him a privilege to protect confidential informants and their information.” Id. at 673, 92 S.Ct. 2646. The Massachusetts trial court denied his motion to quash made on First Amendment and other grounds and ruled that the journalist “had no constitutional privilege to refuse to divulge to the grand jury what he had seen and heard, including the identity of persons he had observed.” Id. Like Branzburg, Pappas petitioned for certiorari to the United States Supreme Court.
In the final petition consolidated in the Branzburg proceedings, the Court considered the petition for certiorari of the United States from a decision of the Ninth Circuit Court of Appeals, Caldwell v. United States, 434 F.2d 1081 (9th Cir.1970), in which the circuit had recognized a qualified testimonial privilege for newsmen arising from the First Amendment and allowing a reporter claiming protection under the privilege to refuse to testify before a grand jury investigating allegations of violations of numerous criminal statutes by the Black Panther Party in California. The reporter in Caldwell had engaged in investigative journalism directed toward the Black Panthers at a time when they were suspected of such crimes as making threats against the President of the United States and a possible conspiracy to assassinate the President, as well as interstate travel to incite rioting and the commission of mail frauds and swindles. He claimed to have obtained information from confidential informants.
As can be seen from the account of the underlying facts in Branzburg, there is no material factual distinction between the petitions before the Supreme Court in Branzburg and the appeals before us today. Each of the reporters in Branzburg claimed to have received communications from sources in confidence, just as the journalists before us claimed to have done. At least one of the petitioners in Branzburg had witnessed the commission of crimes. On the record before us, there is at least sufficient allegation to warrant grand jury inquiry that one or both journalists received information concerning the identity of a covert operative of the United States from government employees acting in violation of the law by making the disclosure. Each petitioner in Branzburg and each journalist before us claimed or claims the protection of a First Amendment reporter’s privilege. The Supreme Court in no uncertain terms rejected the existence of such a privilege. As we said at the outset of this discussion, the Supreme Court has already decided the First Amendment issue before us today.
In rejecting the claim of privilege, the Supreme Court made its reasoning trans *19 parent and forceful. The High Court recognized that “the grand jury’s authority to subpoena witnesses is not only historic ... but essential to its task.” 408 U.S. at 688, 92 S.Ct. 2646 (citation omitted). The grand juries and the courts operate under the “longstanding principle that ‘the public has a right to every man’s evidence,’ except for those persons protected by constitutional, common law, or statutory privilege.” Id. (citations and internal punctuation omitted). The Court then noted that “the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination.” Id. at 689-90, 92 S.Ct. 2646. The Court then expressly declined “to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy.” Id. at 690, 92 S.Ct. 2646. In language as relevant to the alleged illegal disclosure of the identity of covert agents as it was to the alleged illegal processing of hashish, the Court stated that it could not “seriously entertain the notion that the First Amendment protects a newsman’s agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about a crime than to do something about it.” Id. at 692, 92 S.Ct. 2646.
Lest there be any mistake as to the breadth of the rejection of the claimed First Amendment privilege, the High Court went on to recognize that “there remain those situations where a source is not engaged in criminal conduct but has information suggesting illegal conduct by others.” Id. at 693, 92 S.Ct. 2646. As to this category of informants, the Court was equally adamant in rejecting the claim of First Amendment privilege:
[W]e cannot accept the argument that the public interest in possible future news about crime from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future.
Id. at 695, 92 S.Ct. 2646.
The Branzburg Court further supported the rejection of this claimed privilege by the commonsense observation that “it is obvious that agreements to conceal information relevant to the commission of crime have very little to recommend them from the standpoint of public policy.” Id. at 696, 92 S.Ct. 2646. While the Court recognized the right of the press to abide by its agreements not to publish information that it has, the Court stated unequivocally that “the right to withhold news is not equivalent to a First Amendment exemption from an ordinary duty of all other citizens to furnish relevant information to a grand jury performing an important public function.” Id. at 697, 92 S.Ct. 2646.
We have pressed appellants for some distinction between the facts before the Supreme Court in Branzburg and those before us today. They have offered none, nor have we independently found any. Unquestionably, the Supreme Court decided in Branzburg that there is no First Amendment privilege protecting journalists from appearing before a grand jury or from testifying before a grand jury or otherwise providing evidence to a grand jury regardless of any confidence promised by the reporter to any source. The Highest Court has spoken and never revisited the question. Without doubt, that is the end of the matter:
Despite the absolute and unreversed answer to the question of constitutional privilege by the Supreme Court in Branzburg, appellants nonetheless persist in arguing that the District Court erred in concluding that journalists subpoenaed to reveal their confidential sources before federal grand *20 juries enjoy no First Amendment protection. They base this argument on the concurring opinion of Justice Powell in Branzburg and a case from this circuit, Zenlli v. Smith, 656 F.2d 705, 711 (D.C.Cir.1981). These authorities, either separately or together, provide no support for the existence of such a privilege protecting reporters subpoenaed to a grand jury. Appellants’ argument concerning Justice Powell’s concurrence begins with the fact that the decision of the Supreme Court was reached by a 5-4 divided Court. Thus, each of the justices joining in the result was essential to the result. Therefore, appellants argue, it is the opinion of the least encompassing justice which determines the precedent set by the decision rather than the decision which appellants style a “plurality” opinion authored by Justice White. In support of this proposition, they advance an argument that first admits that when the opinion of an individual justice is not needed for a majority his separate opinion is not a gloss giving authoritative definition to the majority opinion in which he did not join, but rather is no more than his separate thoughts, and “the meaning of a majority opinion is to be found within the opinion itself.” McKoy v. North Carolina, 494 U.S. 433, 448 n. 3, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring). But, appellants argue, when the individual justice is needed to constitute the majority, “the opinion is not a majority except to the extent that it agrees with his views. What he writes is not a ‘gloss’ but the least common denominator.” That is to say, the separate opinion “cannot add to what the majority opinion holds, binding the other four justices to say what they have not said; but it can assuredly narrow what the majority opinion holds, by explaining the more limited interpretation adopted by a necessary member of that majority ....” Id. at 462 n. 3 (Scalia, J., joined by Rehnquist, C.J., and O’Connor, J., dissenting).
Without attempting to resolve any dispute or difference that may exist between Justice Blackmun and the three dissenting justices in McKoy, even if we accept Justice Scalia’s analysis at full value, it does not help appellants in this case. Justice Powell’s concurring opinion was not the opinion of a justice who refused to join the majority. He joined the majority by its terms, rejecting none of Justice White’s reasoning on behalf of the majority. He wrote separately “to emphasize” what seemed to him “to be the limited nature of the Court’s holding.” 408 U.S. at 709, 92 S.Ct. 2646 (Powell, J., concurring). Justice White’s opinion is not a plurality opinion of four justices joined by a separate Justice Powell to create a majority, it is the opinion of the majority of the Court. As such it is authoritative precedent. It says what it says. It rejects the privilege asserted by appellants.
Nonetheless, appellants urge that Justice Powell must have been contemplating the creation or recognition of some further sort of First Amendment privilege for reporters asserting confidential sources, else why would he have bothered writing? To that, the United States replies that by its terms Justice Powell’s opinion recognizes only that
if the newsman is called upon to give information bearing only on a remote and tenuous relationship to the subject investigation, of if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered.
Id. at 710, 92 S.Ct. 2646 (emphasis added).
Therefore, the United States contends, Justice Powell, who expressed no disagreement with the majority about the existence *21 of a constitutional privilege, only emphasized that there would be First Amendment protection in cases of bad faith investigations. Appellants counter that Justice Powell could not have meant what the United States argues, as this would have given reporters no more protection than other citizens. However, they never make it clear why they are convinced that Justice Powell must have intended to give reporters more protection than other citizens. The Constitution protects all citizens, and there is no reason to believe that Justice Powell intended to elevate the journalistic class above the rest. Cf. Branzburg at 690, 92 S.Ct. 2646 (“the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination.”).
In any event, whatever Justice Powell specifically intended, he joined the majority. Not only did he join the majority in name, but because of his joinder with the rest of a majority, the Court reached a result that rejected First Amendment privilege not to testify before the grand jury for reporters situated precisely like those in the present case. As we noted above, there is no factual difference between Branzburg and the present case. If Justice Powell in any way meant to afford more protection than was afforded by the rest of the majority, that protection cannot possibly extend to appellants as Branzburg is directly on point and reached a result in which Justice Powell joined, rejecting the applicability of constitutional privilege.
Zerilli cannot possibly help appellants, although they assert that Zerilli, citing Justice Powell’s “deciding vote” in Branzburg, recognized, at least in dicta, a reporter’s privilege in civil cases and held that Branzburg was not controlling as to that issue. Indeed, the Zerilli Court expressly distinguished its case from Branzburg. “Although Branzburg may limit the scope of a reporter’s First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective law enforcement is absent, that case is not controlling.” 656 F.2d at 705. Zerilli has no force in the present case. Even if Zerilli states the law applicable to civil cases, this is not a civil case. Zerilli could not subtract from the Supreme Court’s holding in Branzburg. Zerilli, along with several other lower court decisions cited by appellants, may recognize or at least suggest the possibility of privileges under various circumstances. None of them can change the law applicable to grand juries as set forth in Branzburg. As the Supreme Court has told us:
If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the court of appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.
Rodriguez de Quijas v. Shearson/American Express, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The Supreme Court has not overruled Branzburg:
B. The Common Law Privilege
Appellants argue that even if there is no First Amendment privilege protecting their confidential source information, we should recognize a privilege under federal common law, arguing that regardless of whether a federal common law privilege protecting reporters existed in 1972 when Branzburg was decided, in the intervening years much has changed. While appellants argue for an absolute privilege under the common law, they wisely recognize the possibility that a court not recognizing such an absolute privilege might nonetheless find a qualified privilege. They therefore also argue that if there is a qualified privilege, then the government has not *22 overcome that qualified privilege. The Court is not of one mind on the existence of a common law privilege. Judge Sentelle would hold that there is, no such common law privilege for reasons set forth in a separate opinion. Judge Tatel would hold that there is such a common law privilege. Judge Henderson believes that we need not, and therefore should not, reach that question. However, all believe that if there is any such privilege, it is not absolute and may be overcome by an appropriate showing. All further believe, for the reasons set forth in the separate opinion of Judge Tatel, that if such a privilege applies here, it has been overcome. Therefore, the common law privilege, even if one exists, does not warrant reversal.
C. The Due Process Argument
While appellants insist that their 'privilege is absolute, they assert a secondary line of argument that if their privilege is conditional, then their due process rights have been violated by the refusal of the Special Counsel and the District Court to provide them access to the Special Counsel’s secret evidentiary submissions in support of the enforcement of the subpoenas. This argument is without merit. As appellants themselves admit in their brief, this circuit has recognized that “a district court can ensure that [grand jury] secrecy is protected by provisions for sealed, or when necessary ex parte, filings.” In re Grand Jury, 121 F.3d 729, 757 (D.C.Cir.1997). Indeed, the rule of grand jury secrecy is so well established that we have noted that “[t]here is a plethora of authority recognizing that the grand jury context presents an unusual setting where privacy and secrecy are the norm.” In re Sealed Case, 199 F.3d 522, 526 (D.C.Cir.2000) (collecting authorities).
As the Supreme Court has reminded us on occasion, “the grand jury is an institution separate from the courts.” United States v. Williams, 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). The function of that separate institution is to “serv[e] as a kind of buffer or referee between the government and the people.” Id. The function of the grand jury “depends on ‘maintaining the secrecy of the grand jury proceedings in the federal courts.’ ” In re Sealed Case, 199 F.3d at 526 (quoting United States v. Procter & Gamble Co., 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)), The authori-. ties collected in In re Sealed Case recite the broad variety of circumstances in which the courts have upheld this grand jury secrecy, a secrecy that has been the persistent rule for grand jury proceedings for at least four hundred years. See Douglas Oil v. Petrol Stops Northwest, 441 U.S. 211, 218 n. 9, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) (“Since the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye.”).
In the Douglas Oil decision, the Supreme Court catalogs multiple reasons for preserving the ancient secrecy of the grand jury:
(1) disclosure of pre-indictment proceedings would make many prospective witnesses “hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony”; (2) witnesses who did appear “would be less likely to testify fully and frankly as they would be open to retribution as well as inducements”; and (3) there “would be the risk that those about to be indicted would flee or would try to influence individual grand jurors to vote against indictment.”
In re North (Omnibus Order), 16 F.3d 1234, 1242 (D.C.Cir., Spec.Div., 1994) (quoting Douglas Oil Co., 441 U.S. at 218-19, 99 S.Ct. 1667).
*23 Appellants have offered nothing to take the present grand jury investigation outside the general rule, let alone elevate their objections to constitutional due process status. Indeed, appellants’ argument is principally built around a case from another circuit never authoritative here, no longer authoritative in the circuit of its origin, and distinguishable on its facts from the beginning. In United States v. Dinsio, 468 F.2d 1392 (9th Cir.1972), the court ruled that a defendant who had been held in contempt for refusing to furnish finger and palm print exemplars to a federal grand jury was deprived of her due process rights when the district court refused to let her inspect an ex parte government affidavit upon which the court had determined that the grand jury’s request was reasonable. The Ninth Circuit itself has since declared that “to the extent that our decision in United States v. Dinsio ... may be considered to support the witness in his refusal to cooperate, it has been superseded by United States v. Mam [410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) ], and United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).” In re Braughton, 520 F.2d 765, 767 (9th Cir.1975). The Ninth Circuit went on to say “nothing in the law of this circuit now requires a court to interrupt a grand jury while a recalcitrant witness produces a series of mini trials challenging the reasonableness of the government’s efforts to obtain fingerprint, voice, or handwriting exemplars or the relevance of such exemplars to the government’s case.” Id.
Similarly, Dinsio was never the law of this circuit, just as it is no longer the law of the Ninth Circuit, and nothing in the law of the District of Columbia Circuit requires or has ever required a district court to interrupt the grand jury while a recalcitrant witness enjoys a series of mini trials over his access to materials cloaked by grand jury secrecy.
Assuming for the sake of this case that the general rule of grand jury secrecy is not sufficient to justify the District Court’s use of in camera and ex parte proceedings, we further note that we have approved the use of such a procedure in other cases raising privilege claims. In In re Sealed Case No. 98-3077, 151 F.3d 1059 (D.C.Cir.1998), a case, like this one, involving the use of in camera and ex parte proceedings in the context of a Rule 6(e) motion by the government, we upheld their use, and in so doing, relied, at least in part, on precedent established in privilege analysis. We observed there that “courts often use in camera, ex parte proceedings to determine the propriety of a crime fraud exception to the attorney-client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings.” Id. at 1075 (citing In re Grand Jury, 103 F.3d 1140, 1145 (3d Cir.), cert. denied sub nom. Roe v. United States, 520 U.S. 1253, 117 S.Ct. 2412, 138 L.Ed.2d 177 (1997)). Having previously noted the propriety of the procedures to protect the well-established attorney-client privilege, we are persuaded that a similar protection of grand jury secrecy is appropriate to protect whatever privilege, if any, may exist between a reporter and a confidential source.
We affirm the District Court’s ruling on the maintenance of the seal of grand jury secrecy.
D. Department of Justice Guidelines
In their final argument for reversal of the District Court’s contempt finding, appellants contend that the Special Counsel did not comply with the Department of Justice guidelines for issuing subpoenas to news media and that such failure provides an independent basis for reversal. The District Court expressed its doubt that the DOJ guidelines were enforceable, but *24 found that even if they were, Special Counsel had fully complied with the guidelines. Because we conclude that the guidelines create no enforceable right, we need not reach the question of the Special Counsel’s compliance.
The guidelines in question are set forth in 28 C.F.R. § 50.10 and the United States Attorney’s Manual, § 9-2.161. Those guidelines provide that subpoenas for testimony by news media must be approved by the Attorney General, a requirement not pertinent in the present case as the Special Counsel had received delegation of all the Attorney General’s authority, and should meet the following standards:
(a) “In criminal cases, there should be reasonable grounds to believe, based on information obtained from non-media sources, that a crime has occurred, and that the information sought is essential to a successful investigation-particularly with reference to establishing guilt or innocence. The subpoena should not be used to obtain peripheral, nonessential, or speculative information.” 28 C.F.R. § 50.10(f)(1).
(b) Before issuing a subpoena to a member of the news media, all reasonable efforts should be made to obtain the desired information from alternative sources. Id. at §§ 50.10(b), 50.10(f)(3);
(c) Wherever possible, subpoenas should be directed at information regarding a limited subject matter and a reasonably limited period of time. Subpoenas should avoid requiring production of a large volume of unpublished materials and provide reasonable notice of the demand for documents. Id. at § 50.10(f)(6);
(d) “The use of subpoenas to members of the news media should, except under exigent circumstances, be limited to the verification of published information and to such surrounding circumstances as relate to the accuracy of the published information.” Id. at § 50.10(f)(4); and
(e)When issuance of a subpoena to a member of the media is contemplated, the government shall pursue negotiations with the relevant media organization. The negotiations should seek accommodation of the interests of the grand jury and the media. Where the nature of the investigation permits, the government should make clear what its needs are in a particular case as well as its willingness to respond to particular problems of the media. Id. at § 50.10(c).
However, as the District Court correctly observed, the guidelines expressly state that they do “not create or recognize any legally enforceable right in any person.” Id. at § 50.10(n). This reservation has been upheld by several federal appellate and district courts. See In re Special Proceedings, 373 F.3d 37, 44 n. 3 (1st Cir.2004) (noting that DOJ guidelines state that they do not create legally enforceable rights); In re Grand Jury Subpoena American Broadcasting Companies, Inc., 947 F.Supp. 1314, 1322 (D.Ark.1996) (declining to quash subpoena based on failure to comply with DOJ regulations, on ground that regulations, by their own terms, confer no rights on media witnesses). See also In re Grand Jury Proceedings No. 92-b, 42 F.3d 876, 880 (4th Cir.1994) (holding that special prosecutor’s failure to comply with guidelines regarding issuance of subpoenas to attorney, even if applicable, were not enforceable by witness through motion to quash). The guidelines, not required by any constitutional or statutory provision, see In re Special Proceedings, 373 F.3d at 44 n. 3, exist to guide the Department’s exercise of its discretion in determining whether and when to seek the *25 issuance of subpoenas to reporters, not to confer substantive or procedural benefits upon individual media personnel. See In re Shain, 978 F.2d 850, 858 (4th Cir.1992) (holding reporters have no right to seek enforcement of DOJ guidelines before being compelled to testify) (citing United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 738 (1979) (exclusionary rule not applicable to evidence obtained in violation of internal IRS regulations governing electronic surveillance)); In re Grand Jury Proceedings No. 92-4, 42 F.3d at 880 (following In re Shain, 978 F.2d at 854).
Appellants rely on Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). In that case, the Supreme Court stated that “where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required.” Id. at 235, 94 S.Ct. 1055.
Ruiz, however, is distinguishable. Regulations considered by the Court in that case required the publication of directives that “inform the public of privileges and benefits available and of eligibility requirements.” Id. (quotation marks omitted). The Supreme Court found that the publication requirement was intended to benefit potential beneficiaries and therefore invalidated a Bureau of Indian Affairs attempt to limit general assistance benefits to otherwise eligible beneficiaries based on an unpublished eligibility requirement. This reasoning has no applicability to the guidelines before us.
It is well established that the exercise of prosecutorial discretion is at the very core of the executive function. Courts consistently hesitate to attempt a review of the executive’s exercise of that function. See, e.g., United States v. Armstrong, 517 U.S. 456, 464-65, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Federal prosecutors have “broad discretion to enforce the Nation’s criminal laws.” Id. at 464, 116 S.Ct. 1480 (internal punctuation and citations omitted). The prosecutor’s discretion arises from their designation “as the President’s delegates to help him discharge his constitutional responsibility to ‘take care that the laws be faithfully executed.’ ” Id. (quoting U.S. Const. art. II, § 3). Given the nature of the guidelines themselves, and the function they govern, we conclude that the guidelines provide no enforceable rights to any individuals, but merely guide the discretion of the prosecutors. We therefore need not reach the question of the Special Counsel’s compliance with the guidelines, and again we affirm the decision of the District Court.
III. Conclusion
For the reasons set forth above, the judgment of the District Court is affirmed.